DALE, APPELLEE, *v.* OHIO CIVIL SERVICE EMPLOYEES ASSOCIATION ET AL.;
AMERICAN FEDERATION OF STATE, COUNTY AND MUNICIPAL EMPLOYEES,
AFL-CIO, APPELLANT.

[Cite as Dale *v.* Ohio Civ. Serv. Emp. Assn. (1991), 57 Ohio St. 3d 112.]

(No. 89-2047—Submitted November 28, 1990—Decided January 30, 1991.)

*Larry Dale, pro se.*

*Linda K. Fiely; Kirschner, Weinberg & Dempsey, Richard Kirschner* and *Robert D. Lenhard,* for appellant.

H. BROWN, J. In this case, we must determine what standard applies to a defamation claim founded on statements made in the course of a union election, and whether Dale may recover under the appropriate standard. For the reasons which follow, we conclude that an "actual malice" standard applies, and that Dale has not presented sufficient evidence to recover under this standard. Accordingly, we reverse the courts below and enter judgment for AFSCME.

## I
### Standard of Proof Required in Defamation Claims Arising From Statements Made During Union Representation Elections Conducted Under SERB Jurisdiction

At common law, a defendant was strictly liable for publishing a defamatory statement unless he could

prove that the statement was true or that it was protected by some privilege. Prosser & Keeton, Torts (5 Ed. 1984) 804, Section 113. In response to First Amendment concerns, American courts substantially altered the common-law standard of liability. The plaintiff in a defamation case now has the burden of proving both that the statement was false and the defendant was at least negligent in publishing it. See *Lansdowne* v. *Beacon Journal Pub. Co.* (1987), 32 Ohio St. 3d 176, 178-180, 512 N.E. 2d 979, 982-983, and cases therein cited. In *Lansdowne, supra,* we took the further step of imposing a "clear and convincing" standard of proof on plaintiffs in all defamation cases. *Id.* at 180-181, 512 N.E. 2d at 983-985.

In *New York Times Co.* v. *Sullivan* (1964), 376 U.S. 254, the United States Supreme Court established an even stricter rule for certain defamation cases. The stricter rule has come to be known as the "actual malice" standard. *New York Times* involved a suit by an elected city official of Montgomery, Alabama, over an allegedly defamatory political advertisement criticizing the city's treatment of civil rights protestors. *Id.* at 256-258. The court held that the First Amendment limits "a State's power to award damages for libel in actions brought by public officials against critics of their official conduct." *Id.* at 283. In order to protect the "vigor and * * * variety of public debate," the Constitution "prohibits a public official from recovering damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.* at 279-280.

Where the "actual malice" standard is applicable, and the trial results in a verdict for the plaintiff, appellate courts are required to independently review the evidence. *Id.* at 284-286; *Bose Corp.* v. *Consumers Union of United States, Inc.* (1984), 466 U.S. 485, 510-511; see, also, *State, ex rel. Pizza,* v. *Strope* (1990), 54 Ohio St. 3d 41, 560 N.E. 2d 765 (judgment in trial court which, if erroneous, would not result in suppression of protected speech does not receive *de novo* review); *Lansdowne, supra,* at 181, 512 N.E. 2d at 985 (independent review not required where "actual malice" standard does not apply). Here, we must first decide whether the "actual malice" standard applies to the alleged defamation.

### A

### *Application of the "Actual Malice" Standard to Private-Sector Labor Disputes*

In *Linn* v. *United Plant Guard Workers* (1966), 383 U.S. 53, the court imposed the "actual malice" standard on state law defamation claims arising out of labor disputes subject to the jurisdiction of the National Labor Relations Board ("NLRB"). To achieve this end, the court specifically incorporated the standards set in *New York Times* v. *Sullivan, supra.* The court did so, not out of constitutional necessity, but as a means of accommodating the sometimes competing policies of the National Labor Relations Act ("NLRA") and state defamation law. *Id.* at 65. A major objective of the NLRA is to encourage free and vigorous discussion of labor-management issues. *Id.* at 62. State defamation law is intended to redress injuries to personal reputations. *Id.* at 63-64. In order to balance these interests, and to prevent the use of threatened defamation suits as economic weapons, the court held that the plaintiff in such a suit must show that

the defamatory statement was published with actual malice and caused the plaintiff actual damage. *Id.* at 64-65; see, also, *Farmer* v. *United Brotherhood of Carpenters & Joiners of America* (1977), 430 U.S. 290, 305-306 ("The potential for undue interference with federal regulation would be intolerable if state tort recoveries could be based on the type of robust language and clash of strong personalities that may be commonplace in various labor contexts."); *Old Dominion Branch No. 496* v. *Austin* (1974), 418 U.S. 264 (applying *Linn* rule to labor dispute involving federal employees, citing similar policy concerns).

## B

*Definition of a "Labor Dispute"*

The applicability of the *Linn* rule to the facts before us turns upon the definition of a "labor dispute." In *Yeager* v. *Local Union 20* (1983), 6 Ohio St. 3d 369, 6 OBR 421, 453 N.E. 2d 666, we used the definition found in Section 2(9) of the NLRA (Section 152[9], Title 29, U.S. Code): "The term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, *regardless of whether the disputants stand in the proximate relation of employer and employee.*" (Emphasis added.)

As a matter of logic and experience, a "labor dispute" may be something other than a disagreement between the employer and its employees over conditions of employment. The definition of the term given in Section 2(9) of the NLRA reflects this. For example, disputes between rival unions over which has the right to represent a particular group of employees, such as the contest between AFSCME and 1199 in the instant case, clearly concern "the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms and conditions of employment * * *." As Congress recognized during the drafting of the 1947 Taft-Hartley amendments to the NLRA, conflicts between two unions can be every bit as heated and disruptive as conflicts between a union and an employer. See, *e.g.,* H. Report No. 245 on H.R. 3020 (1947) 5, reprinted in NLRB, I Legislative History of the Labor Management Relations Act, 1947 (1985) 296; 93 Cong. Rec. (Apr. 9, 1947) 3327-3329, reprinted in NLRB, II Legislative History of the Labor Management Relations Act, 1947 (1985) 995-997.

The definition contained in Section 2(9) of the NLRA applies specifically to those employers and industries under the jurisdiction of the NLRB; however, we see no reason to limit the use of this definition to NLRB cases. As the instant case demonstrates, labor disputes can occur in public employment. See, *e.g., Ebbing* v. *Hamilton* (1985), 29 Ohio App. 3d 69, 29 OBR 79, 502 N.E. 2d 661 (dispute under collective bargaining agreement). Labor disputes also occur in private industries falling under the jurisdiction of the National Mediation Board by virtue of the Railway Labor Act, see, *e.g., Eastern Air Lines, Inc.* v. *Air Line Pilots Assn.* (S.D. Fla. 1989), 710 F. Supp. 1342 (strike), and private industries whose labor relations are regulated by state administrative agencies, see, *e.g.,* Reynolds, Power and Privilege: Labor Unions in America (1984) 52 (describing intimidating picketing of residences by United Farm Workers and reaction of California Agricultural Labor Relations Board), as well as employment

relationships not subject to the jurisdiction of any administrative agency, see, *e.g., Natl. Labor Relations Bd.* v. *Yeshiva Univ.* (1980), 444 U.S. 672 (union organization campaign among university faculty who were managerial employees not under NLRB jurisdiction); *State, ex rel. Ohio Council 8,* v. *Spellacy* (1985), 17 Ohio St. 3d 112, 17 OBR 260, 478 N.E. 2d 229 (collective bargaining by court employees not under SERB jurisdiction).

Accordingly, we take this opportunity to clarify and reaffirm our prior discussions of this issue, and hold that a "labor dispute" is any controversy over the terms and conditions of employment or the representation of employees for collective bargaining purposes, regardless of whether the disputants stand in the relation of employer and employee, and regardless of whether the dispute is subject to the jurisdiction of the National Labor Relations Board, the State Employment Relations Board, or some other administrative agency.

### C
*Application of the "Actual Malice" Standard to Labor Disputes Governed by R.C. Chapter 4117*

In a previous case, we applied the *Linn* rule to a claim of defamation arising from a handbill circulated by picketers outside an employer's place of business. *Yeager, supra.* Further, in *Local Lodge 1297* v. *Allen* (1986), 22 Ohio St. 3d 228, 22 OBR 407, 490 N.E. 2d 865, paragraph two of the syllabus, we held (citing *Linn* and *Yeager*) that claims of intentional infliction of emotional distress and invasion of privacy

could not be based on the use of "federally protected language" — the epithet "scab" — during a labor dispute.[1] Like *Linn,* these cases involved labor disputes in the private sector within the NLRB's jurisdiction. *Linn, supra,* at 55-56 (union campaign to organize employees of private security company); *Yeager, supra,* at 369-370, 6 OBR at 421-422, 453 N.E. 2d at 667-668 (picketing of private employer); *Local Lodge 1297, supra,* at 228-229, 22 OBR at 407, 490 N.E. 2d at 866-867 (picket-line altercations during strike at pump manufacturer). The instant case is different from *Linn, Yeager,* and *Local Lodge 1297* in that it involves a public-sector labor dispute within the jurisdiction of SERB.

This difference does not present a reason to withhold application of the *Linn* rule. To the contrary, the policy interests expressed by the Supreme Court in *Linn* apply to public-sector labor relations under our statute. Like the NLRA, R.C. Chapter 4117 seeks to encourage the free and vigorous discussion of labor relations issues. This policy requires that participants be allowed considerable latitude for the "* * * bitter and extreme charges, countercharges, unfounded rumors, vituperations, personal accusations, misrepresentations and distortions * * *," *Linn, supra,* at 58, which often characterize labor disputes. Further, as in the private sector, there is the possibility that defamation suits could be used as economic weapons to secure an unwarranted advantage in bargaining. *Linn, supra,* at 64.

Accordingly, we conclude that the public policies underlying R.C. Chapter 4117 would be served by applying the

---

[1] A concurring justice suggested that the tort claims in *Local 1297* were, in substance, an attempt to recover for defamation. *Id.* at 234-235, 22 OBR at 412-413, 490 N.E. 2d at 870-871 (Douglas, J., concurring).

*Linn* rule to public-sector labor disputes. We therefore hold that the "actual malice" standard of *New York Times* v. *Sullivan* applies to defamation claims founded upon statements made by and about participants in a public-sector labor dispute, such as that involved in the instant case.[2]

## II
### Application of the "Actual Malice" Standard to the Instant Case

We next consider whether the trial court and the court of appeals properly found that the "Larry Dale Lied" leaflet was defamatory. Defamation is defined as a false publication which injures a person's reputation. *Cleveland Leader Printing Co.* v. *Nethersole* (1911), 84 Ohio St. 118, 95 N.E. 735. A statement that someone is a liar, such as that made in the leaflet, clearly is one which would tend to injure that person's reputation, and courts have considered such statements to be defamatory on their face. *Prewitt* v. *Wilson* (1905), 128 Iowa 198, 103 N.W. 365; *Smith* v. *Lyons* (1918), 142 La. 975, 77 So. 896; *Paxton* v. *Woodward* (1904), 31 Mont. 195, 78 P. 215; *Colvard* v. *Black* (1900), 110 Ga. 642, 36 S.E. 80; *Murphy* v. *Harty* (1964), 238 Ore. 228, 393 P. 2d 206. As the court below noted, Dale presented sufficient evidence to support a finding that the leaflet was false, and that AFSCME was at least negligent in publishing it. Further, AFSCME failed to establish that the leaflet was protected by a recognized privilege.

However, because the claim of defamation in the instant case is founded upon statements made during a labor dispute, Dale cannot recover unless the evidence shows that the "Larry Dale Lied" leaflet was published with " 'actual malice' — that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *New York Times, supra,* at 279-280. This standard includes the requirement that we conduct an independent review of the sufficiency of the evidence. *Old Dominion Branch No. 496, supra,* at 282; *New York Times, supra,* at 284-286.

Construed most strongly in Dale's favor, the evidence of record establishes the following: Dale made statements to the employees at Wayne County which led them to expect support from 1199 if they formed a union. Relying on this promise of aid, the Wayne County employees formed the Independent Union. Through no fault of Dale's, 1199 failed to provide the expected support. Lozier came to believe, wrongly, that Dale had lied, and communicated that belief to Swank, an agent of AFSCME. Swank then prepared and distributed the leaflet without independently verifying what Lozier had told her.

This is insufficient to establish "actual malice" as defined in *New York Times, supra.* There is no evidence that Swank had any direct knowledge of what happened at Wayne County. Nor was it reckless for Swank to rely on Lozier's statements in preparing the leaflet. Lozier had been intimately involved in the founding of the Independent Union, and was therefore in a position to know what had happened at Wayne County. While Swank may have been negligent in failing to in-

---

[2] AFSCME also argues that the "actual malice" standard applies because Dale was a "limited-purpose public figure" under *Gertz* v. *Robert Welch, Inc.* (1974), 418 U.S. 323. In view of our holding that the "actual malice" standard applies because the defamation occurred during a labor dispute, we need not consider this issue.

quire further before publishing the leaflet, we cannot say she acted with "reckless disregard" in relying on information about the events at Wayne County given by the president of its union local. Mere negligence is not enough to establish actual malice.[3]

### III

### Conclusion

The judgment of the court of appeals is reversed, and final judgment is entered in favor of appellant, AFSCME.

*Judgment reversed.*

MOYER, C.J., SWEENEY, HOLMES, DOUGLAS and RESNICK, JJ., concur.

WRIGHT, J., dissents.

WRIGHT, J., dissenting. While the majority competently sets forth the proper legal standard applicable to the facts of this case, I dissent from the majority's application of that standard to the facts.

The record is replete with evidence sufficient to support a finding that defendant recklessly disregarded the truth, thereby establishing the "actual malice" necessary for recovery. Defendant's agent, Swank, a publisher of the defamatory allegations, had ample opportunity to confirm the defamatory allegations prior to publication, yet chose not to confirm those allegations, in utter disregard for Dale's legally protected interest in his reputation.

Swank and Dale represented competing unions in a certification election at the time of the defamatory allegations. Swank learned of the allegations defaming Dale from another of defendant's organizers, Otten, three to four weeks prior to publishing the defamatory statements. Otten told Swank that Lozier had made the allegations. Swank then called Lozier to hear the allegations firsthand and to gain permission to attribute the statements to Lozier, to contrive the appearance that the statements were from an impartial source. However, Swank failed to confirm the allegations in spite of their nature, the ease with which she could have investigated them, and her experience with thousands of labor disputes which have led her to the belief that accusations require investigation. Instead, Swank published the defamatory material a few days prior to the election for the purpose of damaging Dale's reputation and thereby damaging support for Dale's union in the certification election. As was previously found by a jury and an appellate court, the evidence of defendant's reckless disregard for the truth is clear.

Therefore, I respectfully dissent from the result reached by the majority.

---

[3] Dale cites several cases for the proposition that Swank's failure to investigate before publishing the leaflet constitutes actual malice. *St. Amant* v. *Thompson* (1968), 390 U.S. 727; *Curtiss Publishing Co.* v. *Butts* (1967), 388 U.S. 130; *Tavoulareas* v. *Piro* (C.A.D.C. 1985), 759 F. 2d 90, reversed in part on rehearing en banc (1987), 817 F. 2d 762. These cases actually state that a failure to investigate before publishing *where the defendant has serious doubts that the statement is true* constitutes (or may be considered evidence of) actual malice. *St. Amant, supra,* at 731; *Curtiss Publishing, supra,* at 153; *Tavoulareas,* 759 F. 2d at 127-128, 130-131; 817 F. 2d at 797. As we have noted, there is nothing in the record to suggest that Swank had serious doubts that Lozier was telling the truth. These cases are therefore inapposite.

APPENDIX

# WAYNE COUNTY
# CARE CENTER

# LARRY DALE
# LIED *PROMISED TO HELP*
# LEFT US

TO:  ALL APPLE CREEK EMPLOYEES

Larry Dale came to Wayne County Care Center – made big promises he knew he couldn't keep – when confronted with carrying through with his promises – he left us and could not be found.

AFSCME/OCSEA representative came to see us – he was honest and straight forward, didn't make big promises he knew he could not keep.
Recently all the employees at Wayne County VOTED UNANIMOUSLY to affiliate with AFSCME/OCSEA.

DON'T BE FOOLED BY LARRY DALE'S PROMISES – HE'LL DO THE SAME THING TO YOU HE DID TO US.

EMPLOYEES OF WAYNE COUNTY
CARE CENTER

*Mary Ann Lozier*

PRESIDENT