OPINION.
Julie Rolsen was terminated from her job with Lazarus, Inc., as Clinique Counter Manager, after being accused of stealing a watch from the watch department. Rolsen subsequently brought claims of promissory estoppel, defamation, and breach of implied contract against the company. A jury awarded her $53,400 on her promissory-estoppel claim. The trial court, however, granted a remittitur, reducing the judgment to $17,833. Lazarus received directed verdicts on the contract and defamation claims.
Both parties have appealed. Rolsen asserts in her two assignments of error that the trial court erred by granting Lazarus directed verdicts on the defamation and contract claims and by reducing the damage award. Lazarus, in its cross-appeal, asserts that the trial court erred in denying its motions for a directed verdict, for a judgment notwithstanding the verdict, and for a new trial on the promissory-estoppel claim. For the reasons that follow, we find no merit in Rolsen's first assignment of error and consider her second assignment moot. However, we find merit in Lazarus's assignment of error in its cross-appeal and, therefore, reverse the judgment of the trial court on the promissory-estoppel claim.
 FACTS
Rolsen's firing occurred on October 10, 1996, a day on which she forgot to wear her watch to work at a Dayton Lazarus store. Rolsen testified that, on that day, there was a special promotional event, and consequently she had a special need for a watch, because makeover appointments were scheduled all day and part of her duties was monitoring the consultants performing the makeovers. In order to have a watch to wear, she admittedly took a watch from the display counter in the watch department, removed the tag from the watch, placed the tag behind the keyboard on the cash register so it would not get lost, and then slipped the watch around her wrist. She testified that she had seen other store employees similarly borrowing merchandise, such as sweaters when they were cold, reading glasses when they could not read tags, and barrettes when they were required to wear their hair back. She could not say, however, whether those other borrowings by employees were done with permission or otherwise condoned by store management.
Rolsen did not advise the watch-department sales associate of her actions. When asked why she had not, she explained that, in her view, the watch-department sales associate was too far distant and out of earshot. However, when she returned to the Clinique counter, Rolsen showed the watch to Mary Lynn Meier, a Clinique account coordinator who described herself as the "equivalent to a department manager of the store." Rolsen testified that she considered Meier her "boss" as well as her supervisor; Meier testified that Rolsen was her "subordinate." According to Meier, Rolsen came over to her, told her that she had left her watch at home, and then said words to the effect, "Look at this watch I have borrowed." Meier testified that Rolsen did not, however, tell her that she had taken the watch from the watch display counter, that she had taken the tag off the watch, or that she had chosen not to inform the watch-counter associate. Asked if she had said anything to Rolsen about whether her taking the watch was proper, Meier said, "No," although Meier did testify that she personally saw nothing wrong with Rolsen borrowing the watch. According to Rolsen, she believed that Meier had the authority to grant her permission to wear the watch, and that, by saying nothing critical, Meier had tacitly given her consent to what she had done. Meier testified, however, that she did not have the authority to give Rolsen or any other employee permission to take merchandise off the rack or counter and use it for a day.
Rolsen and Meier both testified that Rolsen had asked Meier and another counter employee to remind her to take the watch off and return it before the end of the day. Rolsen and Meier then worked the counter until noon, at which point they left the store to have lunch together at a mall restaurant, Ruby Tuesdays.
While eating, the two women were interrupted by the security manager of the Lazarus store, Joyce Kyne, and a Lazarus security detective, Joe Hendrickson. Hendrickson had observed Rolsen taking the watch from the watch department — her actions were videotaped by surveillance cameras — and, believing that he had witnessed a theft, had reported the matter to Kyne. Kyne had instructed Hendrickson to put Rolsen under surveillance. Because Rolsen had left the store to go to lunch while still wearing the watch, Kyne and Hendrickson followed her into the restaurant. When they appeared, Rolsen testified that she had immediately realized that the watch was the reason. Rolsen testified, "I said, `Oh, my God, it's about the watch, isn't it?' I forgot to take the watch off before I went to lunch. I realized at that point that Joyce probably had not been briefed on what was happening, otherwise, she would not have been there."
Rolsen testified that Kyne had asked her to accompany her back to her office to discuss the matter. She stated that both Kyne and Hendrickson had "escorted me through the mall into the Lazarus store." According to Rolsen, her colleagues stared at the trio as they progressed through the store, since both Kyne and Hendrickson were known to other employees as being in charge of security. When they arrived at Kyne's office, Rolsen explained to Kyne the circumstances surrounding her wearing the watch and said that Meier could corroborate her story. Bob Monroe, the Human Resources Manager, was called into the office, and Rolsen repeated her story. According to Rolsen, both Kyne and Monroe refused her request that they speak to Meier to verify her story, each telling her that the incident did not concern Meier. Rolsen was told that if she had wished to make use of the watch for a day, she should have purchased it in the morning and returned it for a refund at the end of her shift.
Monroe then left the office to call corporate headquarters in Atlanta, and while he was awaiting a return call, he advised Rolsen that she was immediately suspended and would have to leave the store. Monroe and Hendrickson then walked Rolsen out of the store, dispatching someone else to get her belongings. Later that evening, Monroe called Rolsen at home to tell her that she had been fired due to the severity of the offense. She then went back to the store that same evening to get her remaining personal belongings. While doing so, she was kept under surveillance by security personnel. She described the scene at the Clinique counter as emotional, with both her and her colleagues crying over her firing.
 DEFAMATION
In her first assignment of error, Rolsen argues that the trial court erred by granting Lazarus's motion for a directed verdict on her defamation claim. She contends that there was evidence of record upon which a reasonable person could conclude that Lazarus had defamed her by (1) announcing to her colleagues that she had been fired for theft, (2) having security personnel escort her through the store in front of her colleagues, and (3) making it necessary to indicate to prospective employers that she had been dismissed for theft.
As this court has previously noted, when an act of alleged defamation has occurred in a business or professional context by someone whose job gives to them a legitimate interest in the matter, it is subject to a qualified privilege. The result is that the plaintiff must prove not only that the representations were untrue, but that they were made with actual malice. SeeContadino v. Tilow (1990), 68 Ohio App.3d 463, 469-470,589 N.E.2d 48, 52. A showing of actual malice requires evidence that the alleged perpetrator, acting out of spite or ill will, made the representations either with knowledge that they were false, seeHahn v. Kotten (1975), 43 Ohio St.2d 237, 331 N.E.2d 713, or with reckless disregard for the truth. See New York Times Co. v.Sullivan (1976), 376 U.S. 254, 84 S.Ct. 710.
To demonstrate a reckless disregard for the truth, the plaintiff must present clear and convincing evidence that the untrue statements were made as a result of the defendant's failure to act reasonably to discover the truth. See Lansdowne v. BeaconJournal Publishing Co. (1987), 32 Ohio St.3d 176, 180,512 N.E.2d 979, 984. However, in order for the defendant to fail to act reasonably in such a situation, he or she must first possess some degree of subjective doubt concerning the statements. A person speaking with moral certainty about a subject with which he or she has a qualified privilege, no matter how misguided, cannot be said to be acting with actual malice. As the Ohio Supreme Court has stated,
 In order to establish "reckless disregard," the plaintiff must present sufficient evidence to permit a finding that the defendant had serious doubts as to the truth of his publication. Thus, the failure to investigate before publishing will not defeat a qualified privilege, unless the defendant entertained serious doubts as to the truth of the statements or the veracity or accuracy of his sources.
A B-Abell v. Columbus/Cent. Ohio Bldg. Constr. Trades Council
(1995), 73 Ohio St.3d 1, 12-13, 651 N.E.2d 1283, 1293-1294, citingSt. Amant v. Thompson (1968), 390 U.S. 727, 88 S.Ct. 1323, andDale v. Ohio Civ. Serv. Emp. Assn. (1991), 57 Ohio St.3d 112,567 N.E.2d 253.
Examples of "reckless disregard" are situations in which the defendant fabricated the story, relies on his or her imagination, or based the statements on unverified, anonymous sources. See id.
Because mere negligence is not enough to establish actual malice, the test for determining whether the defendant entertained "serious doubt" is not an objective one — i.e., whether a reasonable person should have questioned the truth of his or her statements. Rather, the test is a subjective one, requiring the plaintiff to produce clear and convincing evidence that the defendant "in fact" entertained serious doubts about the truth of his statements or the sincerity or accuracy of his sources. See id.
The trial court's decision to grant Lazarus a directed verdict on the defamation claim presents this question of law: whether, construing the evidence most strongly in favor of Rolsen, reasonable jurors could have come to but one conclusion, that being that she was not defamed. See Strother v. Hutchinson
(1981), 67 Ohio St.2d 282, 423 N.E.2d 467.
Having reviewed the record, we hold that Rolsen did not present any evidence upon which a reasonable person could have concluded that any of the Lazarus employees involved in her firing acted with actual malice. There is no evidence that any of the principals thought her innocent of what, in their view, constituted a form of in-store theft. Nor is there any evidence that they subjectively entertained "serious doubts" about whether what she did was impermissible under company rules. Rather, the evidence demonstrates that Kyne, Monroe, and Hendrickson were absolutely convinced that Rolsen's actions constituted a theft of the watch, even if they accepted her explanation. In the company's view, there was simply no authority upon which she could have borrowed the watch in such a manner without first paying for it. Thus, the fact that no one spoke to Meier to corroborate Rolsen's story is immaterial, since, in the view of her accusers, Meier was without authority to sanction what Rolsen had done.
Rolsen additionally argues that her physical treatment — for example, being led through the store by security — constituted a form of defamation by conduct under our decision in Uebelacker v.Cincom Systems, Inc. (1988), 80 Ohio App.3d 97, 608 N.E.2d 858. We disagree. The actions of the Lazarus employees here simply do not compare to the extreme, outrageous conduct of the company's employees in Uebelacker. Nor do we find persuasive Rolsen's argument that she was defamed by her own republication of the reason for her firing in applying for subsequent positions.
In sum, although the jury may have been given sufficient evidence to have wished that Lazarus had treated Rolsen more leniently and open-mindedly in light of the obvious mitigating factors involved, there was simply no evidence by which the jury could have clearly and convincingly found that the company's employees either spread deliberate falsehoods about Rolsen or possessed serious doubts that her borrowing of the watch constituted in-store theft. Thus, we affirm the trial court's decision to grant the company a directed verdict on the defamation claim.
 IMPLIED CONTRACT
Rolsen argues that the trial court erred by granting Lazarus a directed verdict on her claim that her firing violated an implied contract limiting the company's right to fire her at will. She bases this argument on three grounds: (1) that Lazarus had a practice of terminating employees only for just cause; (2) that Lazarus had a practice and policy of progressive discipline; and (3) that Meier's acquiescence in her borrowing of the watch constituted an implied promise that she would not be fired for doing so.
According to the express terms of her employment with Lazarus, Rolsen's employment was at will. An at-will employment may generally be terminated at any time by either party, for no reason or for any reason. See Wright v. Honda America Mfg., Inc. (1995),73 Ohio St.3d 571, 653 N.E.2d 381. Concededly, the at-will status of an employee may be modified by a subsequent express or implied contract altering the at-will relationship. See Mers v. DispatchPrinting Co. (1985), 19 Ohio St.3d 100, 483 N.E.2d 150, paragraph two of the syllabus. However, here the terms of Rolsen's employment expressly disclaimed that any company employee below the rank of Senior Vice President of Human Resources could alter her at-will status. Her employment application with the company spelled this out unequivocally, stating,
 I agree to conform to the rules and regulations of the Company, and if employed, I understand and agree that my employment is at-will and no employment contract rights have been created. I also understand and agree that my employment may be terminated at any time with or without cause, and with or without advance notice at the option of either the Company or myself. I also understand that no supervisor, manager or other representative of the company has any authority to enter into any express or implied contract for employment for any specific period of time. Any agreement contrary to the above must be in writing and must expressly state that it is a contract and be signed by the Senior Vice President, Human Resources.
(Emphasis supplied.)
 Given the express terms of Rolsen's employment, plainly stating that she was an at-will employee subject to termination "with or without cause" unless otherwise agreed to in writing
by the Senior Vice President in charge of Human Resources, her arguments in favor of an implied contract are unpersuasive. See Hall v. The Jewish Hosp. of Cincinnati (June 2, 2000), Hamilton App. No. C-990571, unreported. Although several Lazarus employees testified that the company "d[id] not take personnel actions without good reason," this fact alone could not alter the express terms of Rolsen's employment. Every company, presumably, does not take personnel actions without good reason. Simply because a company does not fire its at-will employees arbitrarily does not mean that it has assented to a modification of their at-will status. If such were the case, a company would have to either espouse a policy or engage in a practice of random firings in order to avoid such a modification.
Rolsen's argument that Lazarus had a practice of progressive discipline, and that such a practice was not followed here, is similarly unpersuasive. The policy to which she refers appears in the employee handbook. The handbook, however, expressly disclaims that it creates any contractual rights. In fact, Rolsen was required to sign the following statement contained in the handbook: "I understand that nothing in this handbook is to be construed as a direct, implied or inferred contract of employment."
Finally, we reject Rolsen's argument that Meier's acquiescence in her borrowing of the watch constituted a promise that she would not be fired for doing so. According to the express terms of her employment, only the Senior Vice President in charge of Human Resources could alter the at-will nature of her employment inwriting. Therefore, even if Meier had intended to make such a promise, she had no authority to do so. Second, as Lazarus correctly points out, there is no evidence to suggest that Meier intended to make such a promise. As we have held before, simply because an employee chooses to subjectively believe that he or she is something more than an at-will employee, that does not create an implied contract. An implied contract requires more than just an inference by one of the parties; there must be a meeting of the minds and mutual assent. See Weiper, supra; Reasoner v. BillWoeste Chevrolet, Inc. (1999), 134 Ohio App.3d 196, 730,730 N.E.2d 992, 995.
We hold, therefore, that there was no evidence of record from which a reasonable person could conclude that Lazarus had entered into an implied contract altering Rolsen's at-will employment status.
 PROMISSORY ESTOPPEL AND REMITTITUR
In her second assignment of error, Rolsen argues that the trial court erred by reducing the damages the jury awarded on her promissory-estoppel claim. In its sole assignment of error in its cross-appeal, Lazarus argues that the trial court erred in denying its motions for a directed verdict, a judgment notwithstanding the verdict, or a new trial on the same claim. Since it attacks the judgment itself, we address Lazarus's assignment first.
In addition to an implied contract, a second exception applies to the at-will doctrine: promissory estoppel. See Mers, supra, paragraph three of the syllabus. In order for this exception to apply, however, there must be a clear, unambiguous promise of employment by the employer, and the employee must reasonably rely on that promise. See Mers, supra, paragraph three of the syllabus; Weiper, supra; Reasoner, supra. The test is "whether the employer should have reasonably expected its representation to be relied upon by the employee, and if so, whether the expected action or forbearance actually resulted and was detrimental to the employee." Mers, supra, paragraph three of the syllabus.
The basis of Rolsen's promissory-estoppel claim was that Meier's acquiescence in her borrowing of the watch constituted a promise, expressed in words and conduct, that "she would not be fired for using the watch." According to Rolsen, when she approached Meier and advised her of her plan to use the watch, "it was incumbent on Meier, if such conduct was improper, to stop it or to make Plaintiff aware of the consequences." Meier's failure to do so, she contends, made it reasonable for her to believe that Meier had given her authorization to use the watch, accompanied by a promise that she would not be fired for doing so.
The fallacy of this argument is several-fold. First, according to the express terms of her employment, only the Senior Vice President in charge of Human Resources could alter the terms of Rolsen's at-will employment. In fact, the express terms specifically stated that a manager-level employee did not have the authority to enter into a contract for extended employment. Thus, even if we assume that Meier had made a promise of continued employment, Rolsen's reliance upon it would not have been reasonable, since she was expected to have read and understood the language in her employment application. Second, Meier's words and actions, as nebulous as they were, fell far short of a clear, unambiguous promise of continued employment. Meier testified that she did not say anything to Rolson concerning the propriety of Rolsen taking the watch, commenting only upon its appearance — that she considered it unattractive. Although she testified that she did not personally feel that borrowing the watch was wrong, Meier did not convey any sort of promise to Rolsen that she was immune from punishment should she get caught by other company personnel ranked above her. Indeed, Meier could not have made such a promise since, as she testified, she knew she did not have the authority to grant employees leave to take merchandise for their own personal use.
We hold, therefore, that, as a matter of law, Meier's words and conduct did not constitute a clear and unambiguous promise of continued employment. Her silence and failure to protest could have been construed in any number of ways, such as a personal willingness to allow Rolsen to wear the watch at her own risk. To hold otherwise would create a rule that passive acceptance by a lower-echelon store manager of a rules infraction that he or she has no authority to condone creates a binding promise on the company that no disciplinary action will be taken. Such a result is completely unsupported by law.
We thus find merit in Lazarus's assignment in its cross-appeal. Even construing the evidence most strongly in favor of Rolsen, reasonable minds could not have concluded that Meier had made a clear and unambiguous promise of continued employment, or that Rolsen's reliance on such a promise, even if made, was reasonable. We hold, therefore, that the trial court erred in denying Lazarus's motion for a directed verdict on Rolsen's promissory-estoppel claim. Consequently, Rolsen's second assignment of error, in which she argues that the trial court erred in reducing the damage award on this claim, is rendered moot.
In sum, we sustain Lazarus's sole assignment of error, overrule Rolsen's first assignment of error, and deem Rolsen's second assignment to be moot upon our validation of Lazarus's assignment of error. Thus, we affirm the judgment entered below to the extent that it granted directed verdicts to Lazarus on Rolsen's contract and defamation claims. However, upon our determination that the trial court erred in denying a directed verdict for Lazarus on Rolsen's promissory-estoppel claim, we reverse that portion of the judgment awarding Rolsen damages on her promissory-estoppel claim and enter judgment for Lazarus on that claim.
Judgment accordingly.
 SUNDERMANN, J., concurs.
HILDEBRANDT, P.J., concurs separately.