OPINION
{¶ 1} This case involves a second failed lawsuit by several police officers against the Village of Potsdam and its council members. The officers first filed in federal court, but their federal claims were dismissed, and the court refused to exercise jurisdiction over the pendant state claims. See Chaney v. Potsdam (C.A.6 2004), 105 Fed. Appx. 18, 2004 WL 1532252 (affirming district court's grant of summary judgment to defendants). Specifically, the rejected federal claims included: 1) that the officers were suspended and then terminated from employment without due process as required by the Fourteenth Amendment; and 2) that defendants violated the officers' liberty interest in being free from undeserved disparagement by government officials. 105 Fed. Appx. at 23-24.
 {¶ 2} Both the United States District Court and the Sixth Circuit Court of Appeals agreed that the officers had no property interest in continued employment. They also agreed that a cause of action for violation of a liberty interest was precluded because the officers failed to request a name-clearing hearing. Id.
 {¶ 3} After the federal suit was dismissed, the officers filed a complaint in state court, alleging breach of an employment contract; defamation/slander; and intentional infliction of emotional distress. In Count IV of the complaint, the officers also requested punitive damages, based on the defendants' allegedly malicious actions. Once again, the defendants moved for summary judgment, and the trial court granted their motions. The court first found that the officers did not have a written employment contract with the Village of Potsdam. The court also held that the officers were at-will employees and were subject to termination at any time for reasons not contrary to law. Regarding the defamation claims, the court concluded that all the statements in question were privileged, were not malicious, or were statements of public opinion related to a public issue. Finally, the court rejected the intentional infliction of emotional distress claims because none of the challenged conduct was actionable under applicable law.
 {¶ 4} The officers now appeal, raising the following assignments of error:
I. The trial court erred when it granted summary judgment to Village of Potsdam on Plaintiffs' breach of contract claim.
II. The trial court erred when it granted summary judgment to each of the individual defendants on Plaintiffs' claims for defamation.
III. The trial court erred when it granted summary judgment to each of the individual defendants on Plaintiffs' claims for intentional infliction of emotional distress.
 {¶ 5} We find all three assignments of error without merit, and will affirm the judgment of the trial court.
 I {¶ 6} The first assignment of error deals with breach of contract, and relates only to the Village of Potsdam. Potsdam is a very small town of about 203 residents, located in Miami County, Ohio. It has no grocery stores or gas stations, and the only functioning business is a beauty shop. Further, Potsdam does not have a stoplight; instead, there is a four-way stop at the intersection of Ohio Route 721 and Cross Street, which are the two main streets in town. Until October, 1999, the Potsdam Police Department consisted of a part-time Sheriff, who worked about ten hours a month, and a few auxiliary deputies, who worked about twenty hours per month. The deputies were basically volunteers, who were only paid $25 per month, regardless of the number of hours they worked. Potsdam did not have any particular crime problems, other than some speeding.
 {¶ 7} The governing forces in Potsdam are the Village Council (Council), which consists of six citizens, and the Mayor, who votes on Council matters in the event of a tie. There are also various village committees, including a safety committee. At some point, the safety committee discussed the possibility of obtaining funding to deal with certain issues like speeding and stop sign violations. Police Chief, Robert Chaney, was a committee member, and mentioned that grants were available to help with such things. Subsequently, Chaney told Council in April, 1999, about grants that might be obtained from the Department of Justice. Council then gave Chaney permission to apply for a grant. The grant program was administered by the Office of Community Oriented Policing Services (COPS Office), a division of the Department of Justice.
 {¶ 8} On May 20, 1999, Potsdam submitted an application for a COPS Universal Hiring Program grant. Although both Chaney and the Potsdam Mayor, Dan Smiley, signed the application, a dispute exists about what input Smiley had into the document. Chaney claims that Smiley helped fill out the application, but Smiley denies providing any information. Instead, Smiley contends his involvement was limited to signing the forms. This dispute is not material, for reasons we will explain later.
 {¶ 9} In any event, the application requested funding for three new full-time and four new part-time officers. Based on COPS statistics, this would have given Potsdam ten times the average officer-per-resident ratio for the State of Ohio.
 {¶ 10} Under the grant program, COPS provides funding for three years, and applicants are required to contribute a smaller amount during the same period. The total cost of the new officers' salaries and fringe benefits for three years was $400,381. Of that amount, the grant would provide $293,067, and Potsdam's share was $107,314. However, at the end of three years, Potsdam was also required to retain and fund all the officers on its own. As part of the application, Potsdam agreed to devise a plan to retain the increased hiring level with state and local funds after the grant ended. Potsdam also had to certify that it would abide by its submitted retention plan.
 {¶ 11} COPS applicants were specifically asked if they had assurances from their local government that the officers would be retained after federal support ended. Chaney checked "no" to this question, and then explained that:
 {¶ 12} "[t]hrough the combined resources provided by the village's general fund, a proposed tax levy, and police mergers, sufficient funds will be available to retain officers."
 {¶ 13} This response was a joint effort of Chaney and Sarah Niswonger, the clerk for the Council, who typed budgetary information into the grant application. When Niswonger saw that part of the application, she contacted Chaney because she did not understand what the Justice Department wanted to know. They discussed what had been brought up in safety committee meetings, such as tax levies, and what had been discussed in Council meetings, and together came up with the wording.
 {¶ 14} The COPS grant advisor for Potsdam was an individual named Andy Dorr. Based on the large officer to resident ratio, Dorr asked Chaney during a July 19, 1999 telephone call to explain whether the high number of officers was justified. At that time, Chaney told Dorr that a merger between Potsdam and Union Township was "imminent," and that Potsdam was also contemplating mergers with a couple of other neighboring jurisdictions. According to Chaney, the mergers would result in Potsdam being responsible for law enforcement services to about 25,000 residents. Based on Chaney's statement that the merger with Union Township was "imminent," Dorr decided that the number of requested officers was reasonable, and processed the grant for approval. Dorr later testified that in the absence of the "imminent" merger with Union Township, he would have recommended that Potsdam be awarded only one full-time officer.
 {¶ 15} Chaney's recollection of the conversation differs. Chaney denied that some type of merger was a prerequisite for getting the grant. He also denied telling Dorr that a merger with Union Township was imminent. According to Chaney, Dorr simply wondered about what the merger was, due to a concern that two groups with COPS funds not merge, i.e., so COPS could avoid a "double-dipping" situation.
 {¶ 16} When the application was submitted, no mergers were pending with any other police departments or townships. There was apparently never any discussion of a tax levy. Moreover, Potsdam's general fund was sufficient to accommodate the twenty-five percent match for the first year of the program, but was not adequate to retain the officers at the end of the grant period.
 {¶ 17} The COPS grant was awarded on September 1, 1999, with effective dates from September 1, 1999 to August 31, 2002. Subsequently, on September 16, 1999, the Council tabled a resolution to merge police services with the Village of Laura, due to issues raised by Chaney and Smiley. Council then accepted the COPS grant at a meeting on October 4, 1999. At this meeting, Chaney told Council that acceptance of the grant would require implementation of a hiring procedure, including an oral review board. During the same meeting, Chaney presented five candidates for patrolman, and Council voted, upon motion, to accept the individuals as patrolmen. The individuals in question were Timothy Allen, David Lykens, Eric Doerzbacher, Jerry Bodey, and Steven Ondreck.
 {¶ 18} The Mayor indicated that because of time constraints, the officers would be sworn in at a later time. However, these officers were then sworn in on the same day, following the council meeting. Other officers sworn in at the same time included Robert Chaney, Oscar Hicks, Wayne Miller, and Anthony Risely. All the officers signed written oaths, which stated that:
 {¶ 19} "I, [the officer's name], do solemnly swear that I will support the Constitution of the United States and the Constitution of the State of Ohio, and I will faithfully, honestly, and impartially discharge the duties of the office of patrolman if [sic] of the Village of Potsdam, State of Ohio, during my continuance in said office, and as the Village of Potsdam has accepted federal grants you will continue said office for four consecutive years, unless removed from office by Ohio Revised Code Section 737.171 of the Ohio Revised Code."
 {¶ 20} The officers did not actually repeat or swear to the clause in the oath that dealt with acceptance of the federal grant. Each officer's signature appears below the written oath. Also on each oath is a jurat, signed by Dan Smiley, as Mayor, which reads: "[s]worn to before me and subscribed in my presence this 4 [sic] day of October, 1999."
 {¶ 21} On October 5, 1999, Chaney and various Council members made a merger presentation at a meeting of the Union Township Trustees. The merger had actually first been mentioned around a year earlier, when one of the Potsdam Council members met with one of the Union Township Trustees. Nothing more really happened, however, until the meeting of October, 1999. At this meeting, the Union Trustees expressed concerns about several points. They also wanted more information. Consequently, Chaney appeared again at the November 8, 1999 meeting of the Union Township Trustees. At that time, Union Township rejected the idea of any type of merger with Potsdam's police force.
 {¶ 22} On November 1, 1999, Chaney reported to Council that "[t]ests for officers applying for COPS grant positions will be administered during the week of November 8, 1999." Tests were administered, and officer training took place, but the project began to fall apart soon after. Specifically, by December, 1999, both community and Council members began expressing concern about Potsdam's ability to pay for the COPS program after the grant ended.
 {¶ 23} At the November 20, 1999 meeting, Council passed various resolutions related to the grant, waiving residency requirements for full and parttime police officers, and setting base salaries for officers. For example, one ordinance (No. 11-20-99) waived residency requirements for part-time officers and established a base salary of $10.90 per hour. Another ordinance (No. 99-27) amended prior Ordinance No. 3-30-98, which was entitled "Appointing Bob Chaney Chief of Police, Establishing the Salary for, Deleting Residency Requirement of the Chief of Police and Declaring an Emergency."
 {¶ 24} The original ordinance provided for a base salary of $7.75 per hour, and specified that the marshal or sheriff work forty hours a month, over a period of ten days. Ordinance No. 99-27 repealed these sections of the prior ordinance and replaced them with provisions increasing the Chief's salary to $16.64 per hour, and requiring him to work a minimum of thirty-two hours per week.
 {¶ 25} By the December 6, 1999 Council meeting, however, open criticism of the grant and concern over Potsdam's ability to pay for the program had emerged. Citizens also complained about discourteous police conduct. Consequently, Council voted to hold a special meeting on December 23, 1999, to reconsider whether it would pass ordinances establishing payroll and paid holidays for Village employees. At some point during the weeks before that meeting, Mayor Smiley contacted Andy Dorr and explicitly asked the basis for the grant. Dorr explained that the grant was based on the merger of the population of Union Township and Potsdam.
 {¶ 26} Smiley had originally supported the grant, but changed his mind when he learned that the grant would financially burden Potsdam. Specifically, while Potsdam had funds to support its share of the grant in the first year, Smiley was concerned about Potsdam's ability to pay for the final years of the grant and for retaining officers.
 {¶ 27} Another issue that arose around the same time was a criminal investigation of Councilman, Carl Yoder, in connection with a contract between Potsdam and the Potsdam Missionary Church, where Yoder was the pastor. For some time, Potsdam's Council had used the church's fellowship hall for meetings, because Potsdam's own meeting hall was too small. There was no formal contract or written agreement between the Village and the church. Instead, as a goodwill gesture, Council typically made a donation to the church at the end of the year to help pay utilities. Because the village solicitor recommended a formal contract, an agreement was reached in April, 1999, though which Potsdam would pay the church $25 per meeting.
 {¶ 28} Yoder was on Council at the time the vote was taken, but abstained from the vote. However, the Council clerk, Sarah Niswonger, later took it upon herself to ask the Miami County Auditor about the propriety of the contract. From there, Niswonger was directed to several other sources, including the Ohio Attorney General's office. Ultimately, Niswonger reported to Council on November 8, 1999, that legislators were not permitted to have an interest in public contracts. When Yoder learned of the potential problem, he agreed with the need to comply with the law. Despite this fact, the newly formed police department launched a criminal investigation and questioned Yoder on two different occasions in December, 1999. The first interrogation lasted a half hour. Subsequently, Chaney asked Yoder to come back for questioning, and Yoder complied. However, when Yoder balked at being videotaped, Officer Bodey produced handcuffs, grabbed Yoder's arm, and threatened to take Yoder to jail. Yoder ended up giving a statement, but later filed a lawsuit against Chaney and Bodey.
 {¶ 29} Needless to say, the December 23, 1999 meeting was not a model of congeniality. Mayor Smiley began the meeting by introducing three charges against Chaney: 1) misrepresentation in the COPS application and dishonesty in a telephone interview; 2) misleading Council into believing the COPS grant was awarded on Potsdam's population alone, when the actual formula for grants was based on 2.13 officers per 1,000 Ohio residents; and 3) discourteous treatment of the public in connection with the Yoder investigation. The former two charges resulted from the discussions Smiley had with Dorr; the latter charge arose from the treatment of Karl Yoder.
 {¶ 30} Copies of the grant application were distributed, and a general discussion of the grant then occurred. Smiley reported on his contact with Dorr, who said the grant had been awarded because Potsdam was policing Union Township. During the discussion, various Council members indicated they felt they had been misled into believing that the grant was only for Potsdam. At the end of the discussion, Council (with one member abstaining) voted to withdraw the grant application, suspend the full-time officers and anything pertaining to the grant and application, and reapply with new numbers. Council also voted to table a resolution authorizing payment of comp time that officers had already worked.
 {¶ 31} The next scheduled meeting was January 3, 2000, but no quorum existed. At that point, however, Yoder was sworn in as Mayor because he had defeated Smiley in the November election. Subsequently, on January 10, 2000, Council was presented with vouchers for paying various officers who had worked. At first, council member, Kevin Swigart, voted to pay the vouchers, However, Swigart changed his mind after Mayor Yoder reminded him that this would require dispensing federal funds. The vote ended in a tie, which Yoder broke by voting "no."
 {¶ 32} On January 13, 2000, Dorr sent Yoder a letter asking for an explanation of how Potsdam intended to fulfill its obligation to retain its officers, in view of the merger failure. Dorr also suggested alternatives, such as withdrawing from the grant entirely or requesting a modification. After speaking with Chaney's attorney, Council voted on January 24, 2000, to dismiss the charges against Chaney, in an effort to resolve the situation peacefully. On January 26, 2000, Yoder informed Dorr that Council had voted to withdraw from the grant. The funds that had already been dispersed to Potsdam ($24,465) were returned to the Justice Department on February 3, 2000.
 {¶ 33} Subsequently, on February 7, 2000, Council voted to suspend all operations of the police department until such time as an investigation of Potsdam's financial stress could be completed. This vote was by motion. At that point, the Village had $2,043.22 in available funds and $4,037.08 in outstanding bills (not including the vouchers of officers that Council had previously declined to pay). The concerns about Potsdam's financial health did not begin with the grant issue. Council Clerk, Sarah Niswonger, had expressed concern about the Village's deteriorating financial health on numerous occasions, beginning in 1997, when she first became involved with the Council.
 {¶ 34} At the April 3, 2000 meeting, Mayor Yoder presented copies of the personnel files and other records of Officers Doerzbacher, Ondreck, Lykens, and Bodey, whose probationary status would end on April 4, 2000. Yoder recommended that these officers be removed as patrolmen, and Council voted to remove them. Notably, Yoder indicated that "it has not been the past practice of the Mayor to return to Council with a final recommendation at the end of a police officer's probationary period." In addition, Council passed Ordinance 04-03-2000-1 (laying off police officers due to fiscal emergency) and Ordinance 04-03-2000-2 (reducing the Village Marshal's position to part-time and reducing the pay). A motion to waive three readings of these ordinances failed, however. Therefore, the ordinances were read by title only. Council also discussed financial options for the police cruiser and a Jeep Cherokee used by the police department, based on inability to pay for the vehicles. The record does not reveal any further action on ordinances relating to the police department.
 {¶ 35} As we mentioned, Appellants contend in the first assignment of error that the trial court erred in granting summary judgment on their breach of contract claims. In this regard, the court found that no written contract existed between the parties, and that Appellants were at-will employees, who were terminable for any reason not contrary to law.
 {¶ 36} Our review of summary judgment decisions is de novo, which means that "we apply the standards used by the trial court." Brinkman v.Doughty (2000),140 Ohio App.3d 494, 496, 748 N.E.2d 116. See, also,Andersen v. Highland House Co., 93 Ohio St.3d 547, 548, 2001-Ohio-1607,757 N.E.2d 329. Summary judgment is appropriately granted where the trial court finds: "(1) that there is no genuine issue as to any material fact; (2) that the moving party is entitled to judgment as a matter of law; and (3) that reasonable minds can come to but one conclusion, and that conclusion is adverse to the party against whom the motion for summary judgment is made, who is entitled to have the evidence construed most strongly in his favor." Harless v. Willis Day Warehousing Co.
(1978), 54 Ohio St.2d 64, 66, 375 N.E.2d 46.
 {¶ 37} In arguing that a written contract existed, Appellants rely on the oath that was signed by each officer after being sworn, as well as ordinances and resolutions that were enacted on November 20, 1999, concerning terms of employment. Based on these documents, Appellants claim that their employment contract was either for a four year term as mentioned in the oath, or for an indefinite period, subject to Potsdam affirmatively acting to revoke its employment offer.
 {¶ 38} Potsdam makes several responses to these points, including the fact that an oath cannot serve as a contract. Additionally, Potsdam argues that even if an oath could serve as a contract, the oaths in this case were not properly executed. Potsdam further points out that Appellants were all either auxiliary or probationary employees who could be terminated for any reason not contrary to law. And finally, Potsdam claims that ordinances passed by Council simply appropriate funds and do not constitute a guarantee of employment.
 {¶ 39} As a preliminary matter, we agree that the oath of office was not a contract of employment. A contract is:
 {¶ 40} "`[a] promise or a set of promises for the breach of which the law gives a remedy, or the performance of which the law in some way recognizes as a duty.' In order to declare the existence of a contract, both parties to the contract must consent to its terms * * *; there must be a meeting of the minds of both parties * * *; and the contract must be definite and certain * * *." Episcopal Retirement Homes, Inc. v. OhioDept. of Indus. Relations (1991), 61 Ohio St.3d 366, 369, 575 N.E.2d 134, quoting from The Restatement of the Law 2d, Contracts (1981) 5, Section 1 (citations omitted).
 {¶ 41} In the present case, the oaths were signed only by the police officers. Although the mayor's signature appears on each oath, his signature was part of the jurat, which is the certificate of an officer or person before whom a writing is sworn. Stern v. Board of Elections ofCuyahoga County (1969), 14 Ohio St.2d 175, 181, 237 N.E.2d 313. "A jurat is not part of an affidavit, but is simply a certificate of the notary public who administered the oath, and is prima facie evidence that the affidavit was properly executed and sworn to before such notary public on the date stated in such affidavit." Id. at 14 Ohio St.2d 175, paragraph one of the syllabus.
 {¶ 42} Furthermore, as Potsdam correctly notes, even if the Mayor could be considered to have "signed" the oaths, R.C. 731.14 specifies that "[all] contracts made by the legislative authority of a village shall be executed in the name of the village and signed on its behalf by the mayor and clerk." Therefore, a contract signed only by the Mayor would have no effect. Compare, Zeigler v. Village of Sycamore (1977),52 Ohio App.2d 247, 249-250, 369 N.E.2d 1058 (statutes pertaining to employment of village marshal and fixing of compensation for village officials and employees do not contemplate that employment contract be executed between village and marshal).
 {¶ 43} The officers in the present case also claim that the ordinances passed on November 20, 1999, created unilateral contracts of employment that invited the officers' performance. Again, we disagree. Appointment of police officers is governed by R.C. 737.15 and 737.16. R.C. 737.15
pertains to chiefs of police, and provides that:
 {¶ 44} "[e]ach village shall have a marshal, designated chief of police, appointed by the mayor with the advice and consent of the legislative authority of the village, who need not be a resident of the village at the time of appointment but shall become a resident thereof within six months after appointment by the mayor and confirmation by the legislative authority unless such residence requirement is waived by ordinance, and who shall continue in office until removed therefrom as provided by section 737.171 of the Revised Code."
 {¶ 45} Similarly, R.C. 737.16 governs appointment of deputies, and states that:
 {¶ 46} "[t]he mayor shall, when provided for by the legislative authority of a village, and subject to its confirmation, appoint all deputy marshals, police officers, night guards, and special police officers. All such officers shall continue in office until removed therefrom for the cause and in the manner provided by section 737.19 of the Revised Code."
 {¶ 47} R.C. 737.171 provides various procedures that must be followed when a village police chief is removed from office for cause. These procedures include notice of charges, a hearing before the legislative authority, and a two-thirds affirmative vote for removal or suspension by the members of the legislative authority. Likewise, R.C. 737.19 outlines procedures for suspending or removing deputies, officers, or employees of a village police department for cause. However, none of these procedures apply to probationary employees. See, e.g., Bruns v. Village of ChippewaLake, Medina App. No. 02CA0110-M, 2003-Ohio-3144, at ¶s 6-8, and Wellsv. Village of South Broomfield (Nov. 4, 1996), Pickaway App. No. 96 CA 22, 1996 WL 659278, *2.
 {¶ 48} Specifically, R.C. 737.17 provides that:
 {¶ 49} "[a]ll appointments made under sections 737.15 and 737.16 of the Revised Code shall be for a probationary period of six months' continuous service, and none shall be finally made until the appointee has satisfactorily served his probationary period. At the end of the probationary period the mayor shall transmit to the legislative authority of the village a record of such employee's service with his recommendations thereon and he may, with the concurrence of the legislative authority, remove or finally appoint the employee."
 {¶ 50} Consequently, neither the Mayor nor Council had the ability to offer four-year terms of employment, or even a guarantee of "indefinite employment" to the officers at the time they were hired. Making such offers would conflict with the statutory requirement in R.C. 737.17 that police officers must serve a six-month probationary period.
 {¶ 51} The officers who are plaintiffs in this case are Robert Chaney, Steven Ondreck, Wayne Miller, Jerry Bodey, Timothy Allen, Anthony Risely, Jessica Knox, Eric Doerzbacher, and Oscar Hicks. Miller, Knox, Risely, and Hicks were employed prior to the COPS grant, but only as auxiliary officers. Auxiliary officers do not serve probationary periods and have no statutory right to continued employment. R.C. 737.161; andCurby v. Archon (2000), 216 F.3d 549, 555 (C.A.6 Ohio). As a result, such officers serve at the Mayor's pleasure and are terminable at will. Id.
 {¶ 52} The auxiliary officers, other than Knox, were sworn in again on October 4, 1999, along with Chaney, Ondreck, Bodey, Allen, and Doerzbacher. Chaney, Allen, and Risely were hired as full-time officers; and the rest were to be part-time officers. At that point, all the officers, except possibly Knox and Chaney, were on probationary status for six months, after which time, the Mayor would have removed or finally appointed them, after transmitting their records and a recommendation to Council. R.C. 737.17. The reason Knox was not a probationary employee is that she was never sworn in and never even actually worked for Potsdam. However, assuming for the sake of argument that Knox also became a probationary employee on October 4, she and the other officers who were probationary employees were terminable at will, did not have a right to continued employment, and did not have a right to formal removal procedures. Wells, 1996 WL 659278, at *2.
 {¶ 53} Potsdam claims that Chaney was also a probationary employee, based on the appointment that occurred in October, 1999. In this regard, Potsdam's theory is that a new probationary period arose when Chaney became a full-time chief of police. However, we disagree with this reasoning. Unlike the officers who were previously appointed as auxiliary officers under R.C. 737.161, and later appointed as police officers under R.C. 737.16, Chaney's status as "police chief" never changed between May 4, 1998, and October 4, 1999. In Ordinance 3-30-98, the Council ratified the mayor's appointment of Chaney as Chief of Police, and his six-month probationary period would have begun at that point, i.e., on May 4, 1998. Chaney's hours and wages were increased in an ordinance passed on November 20, 1999, but his status as chief of police never changed.
 {¶ 54} Normally, this would mean that Chaney's probationary period would have ended in November, 1998, and his appointment would have become final at that time. At that point, then, Chaney would have been entitled to the procedures and protections outlined in R.C. 737.171. However, we conclude that Chaney's appointment never became final. Specifically, there is no evidence in the record that Potsdam's Mayor ever complied with R.C. 737.17 before April 4, 2000. As we noted earlier, R.C. 737.17
provides that "[a]t the end of the probationary period the mayor shall transmit to the legislative authority of the village a record of such employee's service with his recommendations thereon and he may, with the concurrence of the legislative authority, remove or finally appoint the employee."
 {¶ 55}
The evidence is undisputed that the Mayor did not follow R.C. 737.17
before April 4, 2000. On that date, Mayor Yoder did transmit records and his recommendations about four officers to Council. However, Yoder also said at the time that "it has not been the past practice of the Mayor to return to Council with a final recommendation at the end of a police officer's probationary period." Because the Mayor failed to follow the statutory procedures, Chaney's appointment never became final and he was still on probationary status at the time police department operations were suspended.
 {¶ 56} In Gannon v. Perk (1976), 46 Ohio St.2d 301, 312-313,348 N.E.2d 342, the Ohio Supreme Court held that the mayor of Cleveland had authority to lay off police officers for reasons of economy. In this regard, the court noted that:
 {¶ 57} "public employees may be laid-off for reasons of economy `notwithstanding statutory or charter provisions to the effect that no employee in the classified service shall be removed except for cause * * *, the view * * * being that such statutory or charter provisions * * * are not intended to restrict the public authorities in their efforts to effect necessary or desirable economies.'" 46 Ohio St. 2d at 312-13, quoting from State ex rel. Buckman v. Munson (1943), 141 Ohio St. 319,48 N.E.2d 109. See, also, McNea v. Voinovich (1982), 70 Ohio St.2d 117,435 N.E.2d 420, and State ex rel. Ohio Civil Service Employees Assn. v.City of Coshocton (1982), 5 Ohio App.3d 5, 5-6, 448 N.E.2d 834
(holding that municipality may abolish police department and contract with county sheriff's department instead).
 {¶ 58} The Supreme Court also commented in Gannon that:
 {¶ 59} "[l]ack of funds induced when projected income falls below anticipated expenses is a legitimate basis for laying off civil service employees, including safety personnel, so long as such layoffs are made in conformity with law. In the instant case, then, the issue becomes whether the layoff of policemen and firemen was made in conformity with the ordinances, charter provisions, and civil service rules of the city of Cleveland." 46 Ohio St.2d at 312-313.
 {¶ 60} Based on the above authority, the issue in the present case is whether suspension of the Potsdam police department operations conformed to law. Because the parties have not submitted any Potsdam ordinances or charter provisions that govern economic layoffs, we must look to the Ohio Revised Code, which provides a basic framework for village government. InToth v. Village of Elmwood (1984), 20 Ohio App.3d 188, 485 N.E.2d 735, the First District Court of Appeals held that a village may permissibly remove employees to relieve a financial emergency. The basis for the court's decision was R.C. 731.10, which states that:
 {¶ 61} "The legislative authority may provide such employment for the village as it determines, and such employees may be removed at any regular meeting by a majority of the members elected to such legislative authority."
 {¶ 62} Toth involved a police officer who was removed from his position due to a financial emergency. The First District Court of Appeals found that council had authority under R.C. 731.10 to remove the employee, but had improperly delegated its authority to the chief of police, who was told to choose between two employees with equal seniority. Subsequently, in Dillingham v. Village of Woodlawn (1993),86 Ohio App.3d 54, 619 N.E.2d 1152, the First District discussed and applied Toth, stating that:
 {¶ 63} "[i]n Toth v. Elmwood Place (1984), 20 Ohio App.3d 188, 20 OBR 232, 485 N.E.2d 735, we held, in the case of a village police officer laid off due to budgetary constraints, that the authority to employ and remove village employees was that of the village council alone under R.C. 731.10. R.C. 737.17 is the more specific statute, however, on theprobationary and final appointment of police personnel and therefore wefind that it governs the situation here." 86 Ohio App.3d at 59, citingBedinghaus v. Moscow (1987), 41 Ohio Misc.2d 1, 536 N.E.2d 58 (emphasis added).
 {¶ 64} The issue in Dillingham was whether a mayor had acted properly in terminating a probationary police officer where the village council had voted to reject the mayor's recommendation. Applying R.C. 737.17, which stated that a mayor may remove or finally appoint an employee "with the concurrence of the legislative authority," the First District held that the mayor had to obtain council's agreement to either remove or finally appoint the officer. Id. Other courts disagree on this point, and find that the mayor alone may discharge a probationary employee. See,e.g., Bruns, 2003-Ohio-3144, at ¶ 10.
 {¶ 65} This conflict is irrelevant for purposes of the present case, as Mayor Yoder did obtain council's agreement to remove four officers at the end of their probationary period. The mayor did not officially remove the remaining officers, however, and the issue remains whether council's actions in suspending operation of the police department for budgetary reasons was proper as to these officers (Chaney, Miller, Allen, Risely, Knox, and Hicks).
 {¶ 66} Notably, Dillingham did not involve a layoff of personnel or elimination of an entire police department for budgetary reasons. Therefore, Dillignham's revision or distinction of Toth, as well as its reliance on R.C. 737.17 is not applicable to the present situation. Specifically, R.C. 737.17 applies when police officers are being removed or finally appointed after a probationary period, but it does not provide instruction or guidance on what procedure should be followed where employees or departments are being eliminated due to economic problems.
 {¶ 67} The present situation is also not addressed in R.C. 737.171 and R.C. 737.19, which outline procedures for removal for cause after final appointment. In the absence of appropriate guidance, we return to R.C.737.10, which states that:
 {¶ 68} "[t]he legislative authority may provide such employees for the village as it determines, and such employees may be removed at any regular meeting by a majority of the members elected to such legislative authority."
 {¶ 69} Because police department operations and hence, its employees, were suspended by a majority of council at a regular meeting, we find that Potsdam adequately complied with the law. Accord, Pullin v. Villageof Hiram, Portage App. No. 2001-P-0416, 2003-Ohio-1973, at ¶ 32 (finding that village may act under R.C. 731.10 by way of motion). The officers argue, however, that Potsdam was required to repeal the prior ordinances establishing full and part-time positions. We disagree. Suspending police department operations pending investigation of financial stress is not inconsistent with establishing positions for officers. A municipality or village must have some flexibility in dealing with its budgetary affairs. Compare McNea, (1982), 70 Ohio St.2d 117, 119, 435 N.E.2d 420
(holding that where city charter and ordinances did not establish mandatory priority for layoffs due to reasons of economy, power to lay off employees reposed in sound discretion of mayor).
 {¶ 70} As the court in Coshocton observed,
 {¶ 71} "[t]he court system is charged with making legal decisions. Legislative bodies are charged with making policy decisions. As long as any reasonable evidence exists on behalf of legislative policy decisions, it is not the function of the court system to second guess such decisions. The citizens, in such case, are entitled to have their future course of operation determined by the council that they elected for such purpose." 5 Ohio App.3d at 8.
 {¶ 72} Accordingly, because no contract of employment existed, and Potsdam acted in conformity with law in suspending police department operations, the first assignment of error is without merit and is overruled.
 II {¶ 73} In the second assignment of error, the officers contend that the trial court erred in granting summary judgment to each of the individual defendants on the officers' claims for defamation. The elements of defamation are that:
 {¶ 74} "First, there must be the assertion of a false statement of fact; second, that the false statement was defamatory; third, that the false defamatory statement was published by defendants; fourth, that the publication was the proximate cause of the injury to the plaintiff; and fifth, that the defendants acted with the requisite degree of fault."Celebrezze v. Dayton Newspapers, Inc. (1988), 41 Ohio App.3d 343,346-347, 535 N.E.2d 755.
 {¶ 75} As a preliminary point, we note that Appellants Knox, Doerzbacher, Hicks, Ondreck, Allen, and Risely testified that they had no knowledge of anything the individual defendants said about them that was false or substantially untrue, or had no claim against them in this regard. Accordingly, these parties have failed to establish triable issues as to defamation, and the trial court acted correctly in granting summary judgment against them.
 {¶ 76} The only claim Bodey made in his testimony was that Yoder's attorney falsely said in the newspaper (in reference to pending litigation between Yoder and Potsdam) that Bodey had handcuffed and arrested Yoder, and had taken him to jail. However, Yoder did not make this statement, nor did Bodey present any evidence that Yoder told his attorney to make such a statement, or even knew the statement was being made. Therefore, summary judgment was also properly granted against Bodey.
 {¶ 77} Miller submitted an affidavit containing language about negative comments made by unidentified council members and village residents, who allegedly compared the Potsdam officers to "Barney Fife," and raised doubt about their competence and ability. Miller's affidavit was identical in this respect to the affidavits of the other officers. However, Miller (as well as the other officers) had ample opportunity to contest summary judgment, but failed to identify or furnish the name of any specific individuals who made such a comment. Notably, "the burden is on the party opposing summary judgment to `set forth specific facts showing that there is a genuine issue for trial.'" Blount v. SchindlerElevator Corp., Franklin App. No. 02AP-688, 2003-Ohio-2053, at ¶ 40. In the absence of such information, we see no triable issues of fact. An additional reason for affirming summary judgment against Bodey and Miller is that the record is devoid of any evidence of "actual malice." The importance of actual malice will be discussed in more detail below.
 {¶ 78} The remaining defamation issues involve Chaney. In his brief, Chaney focuses on: 1) implications by Council member, Patricia Hartley, that Chaney had lied in connection with the COPS grant; 2) statements made by Patricia Walker during a Council meeting to the effect that Chaney "lied on a federal application;" 3) signs that were posted on Patricia Hartley's house; and 4) a comment Yoder made to the effect that Chaney was a "non-functioning police chief."
 {¶ 79} "A statement that someone is a liar * * * clearly is one which would tend to injure that person's reputation, and courts have considered such statements to be defamatory * * *." Dale v. Ohio Civil ServiceEmployees Assn. (1991), 57 Ohio St.3d 112, 117, 567 N.E.2d 253. However, a true statement cannot provide a basis for a libel action. Natl. MedicServ. Corp. v. E.W. Scripps Co. (1989), 61 Ohio App.3d 752, 755,573 N.E.2d 1148.
 {¶ 80} The undisputed facts in this case indicate that Chaney was listed on the COPS application as the contact person in the police department who was familiar with the grant. Chaney certified in the application that the information provided was true and accurate to the best of his knowledge. In addition, Chaney signed a statement attesting to the accuracy of the budget information submitted for the grant. And finally, Chaney signed a "Community Policing Information Worksheet" (CPIW), designating himself as the person who had completed the worksheet.
 {¶ 81} The undisputed facts also indicate that the grant documents contained untrue statements. For example, on page five, the CPIW asks which of several community groups have been consulted to address crime and disorder problems in the community. In answering this question, Chaney stated that neighborhood and tenant associations had been consulted. However, Potsdam did not have any such associations. The CPIW also states that business groups and schools were consulted to address crime and disorder problems in the community. Again, Potsdam did not have any business groups, nor did it have a school. In fact, the nearest school was about five miles away, in a different community. The CPIW further represents that "Neighborhood Watch" activities were being currently performed by citizens in Potsdam. However, Potsdam did not have a "Neighborhood Watch" program.
 {¶ 82} The COPS application asked how Potsdam intended to finance the retention of the officers at the end of the grant period. In response, Chaney said sufficient funds would be available through combined resources from the village's general fund, a proposed tax levy, and police mergers. However, there was no evidence that any type of tax levy was ever proposed. And, when the application was submitted, there were also no pending or expected mergers.
 {¶ 83} Because the COPS grant application contained statements that were untrue, the comments about Chaney were not false or substantially untrue. Consequently, Chaney failed to raise triable issues of fact concerning the first element of his defamation claims against Walker and Hartley. In this regard, we note that Chaney did testify that Mayor Smiley helped fill out the application. Mayor Smiley denied this. However, this factual dispute is irrelevant and does not raise genuine issues of material fact. Specifically, even if another individual helped Chaney, the fact is that Chaney signed the application, attesting to the truth of contents that were not true.
 {¶ 84} As a further matter, even if the statements about Chaney had been false, he was still required to prove that the statements were made with actual malice. The reason for this is that Chaney and the other police officers were "public officials." Soke v. Plain Dealer,69 Ohio St.3d 395, 397, 1994-Ohio-347, 632 N.E.2d 1282.
 {¶ 85} "Actual malice prohibits a public official from recovering any damages for a defamatory falsehood [relating to his official conduct] unless he proves that the communication was made `with knowledge that it was false or with reckless disregard of whether it was false or not.'"Scaccia v. Dayton Newspapers, Inc., Montgomery App. Nos. 18435, 18729, 2001-Ohio-1834, 2001 WL 1517043, *7, quoting from New York Times Co. v.Sullivan (1964), 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (parenthetical material added). "To establish reckless disregard, a defamation plaintiff must present clear and convincing evidence that the false statements were made with a `high degree of awareness of their probable falsity,' * * * or that `the defendant in fact entertained serious doubts as to the truth of his publication.'" Burns v. Rice, 157 Ohio App.3d 620, 2004-Ohio-3228,813 N.E.2d 25, at ¶ 22. "Actual malice is measured at the time of publication." Id.
 {¶ 86} The communications about Chaney's honesty were made during Council meetings and were related to Chaney's official conduct. When the remarks were made, Council members and the Mayor had already talked with the COPS grant advisor, who had told them about alleged misrepresentations Chaney made, including the fact that a merger with Union Township was "imminent." Council members also recalled being told by Chaney that the grant was for Potsdam alone. Furthermore, Council members and the Mayor had been told that Chaney gave Dorr incorrect population figures.
 {¶ 87} Although Chaney denies telling Dorr that a merger with Union Township was "imminent," this is not a material fact dispute that would prevent summary judgment. The important consideration is what the individuals in question believed when the alleged defamatory statements were made. In this regard, there is no evidence that Walker or Hartley made the statements with a high degree of awareness of their falsity or entertained any doubts about their truth. In fact, when they said Chaney had lied, the evidence before them indicated that this was the case.
 {¶ 88} Even if we assume that Chaney denied Dorr's statements when they were presented during the Council meetings, that would not change the outcome. In Burns, the court stressed that "where evidence conflicts and is subject to differing reasonable interpretations, such a dispute supports, rather than precludes, summary judgment for defendants in a public official defamation case. * * * The election to make one of two reasonable interpretations does not demonstrate a disregard for the truth." Burns, 2004-Ohio-3228, at ¶ 38.
 {¶ 89} We also find nothing objectionable about Mayor Yoder's remark that Chaney was a "non-functioning" officer. This remark occurred sometime in June, 2000, or 2001, when Yoder was contacted, in his official role as mayor, by a police chief in Michigan. (The difference in dates is due to the fact that Chaney said in his deposition of July, 2001, that the Michigan incident had occurred three or four weeks before the deposition. However, Chaney's affidavit says the Michigan incident took place in June, 2000).
 {¶ 90} In any event, the incident occurred between four and eighteen months after the Potsdam police department operations had been suspended. Chaney was in Michigan vacationing with his family, and was stopped for speeding. Chaney identified himself as a police officer in Ohio, and showed his police identification. When the officer called Miami County 911, he was told that Potsdam had abolished its police department. The dispatcher for Miami County then called Yoder, who stated that Chaney had the right to carry a gun, but was a nonfunctioning police officer. As a result, the officer in Michigan took Chaney's identification and badge and mailed them to Yoder. There is no evidence that Yoder asked for these articles to be taken away from Chaney.
 {¶ 91} At the time the statement was made, it was literally true. Chaney had not functioned as Potsdam's police chief since department operations were suspended in February, 2000. Furthermore, even if the statement had been false, there is no evidence that Yoder acted with knowledge of the statement's falsity or a high degree of awareness that it was false. Since police operations had been suspended for quite some time, it would be reasonable for anyone to assume that the department and its chief, were "non-functional." Accordingly, the trial court correctly granted summary judgment on this claim as well.
 {¶ 92} In this regard, Chaney alleges that Yoder had "ill will" toward Chaney because of the prior police investigation of Yoder. However, this is not the proper focus. Specifically,
 {¶ 93} "`[a]ctual malice in the context of defamation may not be inferred from evidence of personal spite, ill will, or deliberate intention to injure, as the defendant's motives for publishing are irrelevant. A defamation plaintiff who is required to show actual malice must demonstrate, with convincing clarity, that the defendant published the defamatory statement either with actual knowledge that the statement was false, or with a high degree of awareness of its probable falsity.'"Deoma v. Shaker Heights (1990), 68 Ohio App.3d 72, 82, 587 N.E.2d 425, quoting from Varanese v. Gall (1988), 35 Ohio St.3d 78, 518 N.E.2d 1177. There is no evidence that Mayor Yoder either knew or thought the statement about Chaney's status was false when it was made. The final issue pertains to certain signs that were displayed on Patricia Hartley's house. These signs consisted of four pieces of paper, each containing one word with a circle around the word and a line drawn diagonally through the word. The words were "respect, confidence, trust, and Chaney." Hartley testified that these signs were put up after she ceased being a council member, to express her political statement that she had no confidence in Chaney, did not want him as Potsdam's police chief any longer, and did not feel he could perform his duties in the village. Other area residents also had similar signs on their home.
 {¶ 94} Ohio law allows a "separate and independent protection for opinions," that is not limited to alleged defamatory statements made by media defendants. Wampler v. Higgins, 93 Ohio St.3d 111, 2001-Ohio-1293,752 N.E.2d 962, syllabus. In deciding if speech is protected opinion, "a court must consider the totality of the circumstances. Specifically, a court should consider: the specific language at issue, whether the statement is verifiable, the general context of the statement, and the broader context in which the statement appeared." Vail v. The PlainDealer Publishing Co. 72 Ohio St.3d 279, 1995-Ohio-187, 649 N.E.2d 182, syllabus.
 {¶ 95} We agree with the trial court that Hartley was simply expressing an opinion. Viewed in the broad context, one generally assumes that citizens placing signs on their property are expressing opinions about matters of personal opinion — typically on political issues. The more specific context of this case leads to no different result. Furthermore, the language used "lacks precise meaning and would be understood by the ordinary reader for just what it is — one person's attempt to persuade public opinion." 72 Ohio St.3d at 282-83. Finally, there is no indication that the statements were verifiable, i.e., Hartley did not imply that she had "firsthand knowledge" substantiating the opinion she asserted. Id. at 283. Instead, the statements are simply one-word, brief statements without any claim to a factual foundation. Consequently, under the totality of the circumstances, the statements were protected opinion and are not actionable under Ohio law.
 {¶ 96} Because no genuine issues of material fact exist concerning Plaintiffs' claims for defamation, the trial court did not err in granting summary judgment in favor of the individual defendants.
 III {¶ 97} The final assignment of error challenges the grant of summary judgment on the officers' claims for intentional infliction of emotional distress. Under Ohio law, "[o]ne who by extreme and outrageous conduct intentionally or recklessly causes serious emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm." Yeager v. LocalUnion 20, Teamsters, Chauffeurs, Warehousemen, Helpers of America
(1983), 6 Ohio St.3d 369, 453 N.E.2d 666.
 {¶ 98} "A claim for intentional infliction of emotional distress requires proof of the following elements: (1) that the actor either intended to cause emotional distress or knew or should have known that actions taken would result in serious emotional distress to the plaintiff, (2) that the actor's conduct was so extreme and outrageous as to go beyond all possible bounds of decency and was such that it can be considered as utterly intolerable in a civilized community, (3) that the actor's actions were the proximate cause of the plaintiff's psychic injury, and (4) that the mental anguish suffered by the plaintiff is serious and of a nature that no reasonable man could be expected to endure it." Burkes v. Stidham (1995), 107 Ohio App.3d 363, 375,668 N.E.2d 982.
 {¶ 99} We find no genuine issues of material fact concerning this claim. If we construe all facts in favor of Appellants, there is simply no evidence of conduct so extreme and outrageous that it could be considered intolerable in a civilized community. To the contrary, Potsdam was merely trying to extricate itself from an impending financial morass caused, at least in part, by Chaney's own actions. Therefore, the third assignment of error is without merit and is also overruled.
 {¶ 100} Based on the preceding discussion, the first, second, and third assignments of error are overruled, and the judgment of the trial court is affirmed.
Wolff, J., and Grady, J., concur.