[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Anderson v. WBNS-TV, Inc.*, Slip Opinion No. 2019-Ohio-5196.]

NOTICE

This slip opinion is subject to formal revision before it is published in an advance sheet of the Ohio Official Reports. Readers are requested to promptly notify the Reporter of Decisions, Supreme Court of Ohio, 65 South Front Street, Columbus, Ohio 43215, of any typographical or other formal errors in the opinion, in order that corrections may be made before the opinion is published.

SLIP OPINION NO. 2019-OHIO-5196

ANDERSON ET AL., APPELLEES, *v.* WBNS-TV, INC., APPELLANT.

[Until this opinion appears in the Ohio Official Reports advance sheets, it may be cited as *Anderson v. WBNS-TV, Inc.,* Slip Opinion No. 2019-Ohio-5196.]

*Defamation—Court of appeals applied incorrect standard in determining whether fault element of defamation claim had been met—Court of appeals' judgment vacated and cause remanded.*

(No. 2018-0792—Submitted April 24, 2019—Decided December 18, 2019.)

APPEAL from the Court of Appeals for Franklin County,

No. 17AP-660, 2018-Ohio-761.

_____

DONNELLY, J.

FACTS AND PROCEDURAL HISTORY

{¶ 1} The Columbus Police Department sent an information sheet to appellant, WBNS-TV, Inc. ("WBNS"), among other media outlets, on January 20,

2016. The information sheet described the robbery of a hoverboard from an eight-year-old child that took place in the parking lot of a waterpark on November 26, 2015, and stated that "suspects * * * put a gun to the eight-year-old's head and demanded the hoverboard." The information sheet also asked for help identifying the people in an accompanying photograph "who may have been involved" in the robbery. That photograph depicted siblings Aaron, Aaronana, and Arron Anderson, and it had been taken by a surveillance camera as they entered the waterpark.

{¶ 2} WBNS used the information sheet to prepare a segment that aired during the 5:00 a.m. broadcast on January 21, 2016. During the segment, WBNS employees showed the picture of Aaron, Aaronana, and Arron, while stating: a "girl was riding her hoverboard when robbers went up to her, put a gun to her head and took it. Columbus Police say suspects—seen here—took off in a PT cruiser." During the 6:00 a.m. broadcast that same day, while showing the same picture, WBNS employees stated, "Columbus Police hope you recognize these two men who robbed an 8-year-old girl at gunpoint!" On the WBNS website, www.10tv.com, the picture of Aaron, Aaronana, and Arron was published with the accompanying text, "The suspects put a gun to the 8-year-old girl's head * * *."

{¶ 3} When Nanita Williams (the mother of Aaron, Aaronana, and Arron) saw the early morning broadcast on January 21, 2016, she began screaming and crying, which woke her family. Williams and her children went to the police station, and after approximately four hours of questioning, the police determined that Aaron, Aaronana, and Arron had not been involved in the crime. Shortly thereafter, the Columbus Police Department released a statement that the people in the photograph had spoken to detectives, and after further investigation, the police had determined that they had not been involved in the robbery. Upon receiving this statement, WBNS employees removed the picture from its website. WBNS employees did not subsequently refer to the picture of Aaron, Aaronana, and Arron.

{¶ 4} Appellees, Aaron, Aaronana, Willie Anderson, and Williams, (collectively, "the Andersons"),[1] filed a complaint against WBNS asserting, among other claims, a claim for defamation. WBNS moved for and was granted summary judgment on all counts. The trial court held that the Andersons could not prove an essential element, fault, of their defamation claim, *see Jackson v. Columbus*, 117 Ohio St.3d 328, 2008-Ohio-1041, 883 N.E.2d 1060, ¶ 9 (setting forth the elements of a defamation claim).

{¶ 5} The Andersons appealed, arguing that the trial court had erred in granting WBNS summary judgment on the defamation claim. The court of appeals reversed the trial court's judgment on that claim, stating, "There is no question that WBNS defamed some of the Andersons." 2018-Ohio-761, ¶ 8. The court framed the issue before it as whether "broadcasting an accusation that the Andersons were robbers without investigation by WBNS and based on a set of police documents which claimed only that some of the Andersons were suspects is sufficient proof of a violation of a duty of care to allow the lawsuit to survive a motion for summary judgment." *Id*. at ¶ 11. The court concluded that the lawsuit should survive summary judgment because a genuine issue of material fact existed, and it remanded the cause to the trial court. *Id*. at ¶ 11, 16. *See* Civ.R. 56(C) (setting forth the summary-judgment standard).

{¶ 6} We accepted WBNS's discretionary appeal. 153 Ohio St.3d 1461, 2018-Ohio-3258, 104 N.E.3d 791.

## ANALYSIS

{¶ 7} Attempting to attain the proper balance between protecting the freedom of speech guaranteed by the United States and Ohio Constitutions and

---

1. Aaron, Aaronana, and Arron Anderson are the three people allegedly defamed by WBNS. Appellees in this case are Aaron, Aaronana, and Willie Anderson (the father of Aaron, Aaronana, and Arron Anderson), individually and as guardian of Arron, and Nanita Williams (the mother of Aaron, Aaronana, and Arron Anderson), individually and as guardian of Arron.

protecting citizens from injury to their reputations is fraught with difficulty. This court and the Supreme Court of the United States have grappled with the issue for years. *See, e.g.*, *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 512 N.E.2d 979 (1987) (plurality opinion); *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

{¶ 8} In Ohio, in a case involving a private person who was allegedly defamed in a statement about a matter of public concern, the plaintiff "has the burden of proving both that the statement was false and [that] the defendant was at least negligent in publishing it." *Dale v. Ohio Civil Serv. Emps. Assn.,* 57 Ohio St.3d 112, 114, 567 N.E.2d 253 (1991), citing *Lansdowne*. Moreover, the negligence must be proved by clear and convincing evidence. *Lansdowne* at 180 (*Lansdowne* was not a majority opinion; a year after it was decided, a majority of the court acknowledged that the clear-and-convincing-evidence standard set forth in *Lansdowne* was the appropriate standard of proof, *Oney v. Allen,* 39 Ohio St.3d 103, 106, 529 N.E.2d 471 (1988), fn. 2).

{¶ 9} A defamation claim against a news organization requires proof that (1) the organization made a false statement, (2) the statement was defamatory, (3) the organization published the statement, (4) the plaintiff was harmed as a proximate result of the publication, and (5) the organization acted with the requisite degree of fault in publishing the statement. *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 77. For purposes of its motion for summary judgment, WBNS assumed that the Andersons could satisfy all the elements of a defamation claim with the exception of the fault element. That is, WBNS argued in its motion for summary judgment only that the Andersons could not prove that WBNS acted with the requisite degree of fault in publishing the statements.

{¶ 10} It follows that in its opinion granting summary judgment to WBNS, the trial court focused its analysis on the fault element. In considering WBNS's

argument that the Andersons could not prove that WBNS impermissibly altered the information that the police had supplied, the trial court summarized the facts and said that "[w]ithin this complete context, the Court cannot conclude that a reasonable reader or viewer would interpret the stories as defamatory." But shortly before that statement, the trial court said that its "analysis [was] limited to the fault prong in this case." The trial court's statement regarding WBNS's allegedly defamatory statements was, at best, dictum, which is not binding on this or any other court, *see State ex rel. Gordon v. Barthalow*, 150 Ohio St. 499, 505-506, 83 N.E.2d 393 (1948).

{¶ 11} On appeal, both parties focused their arguments on the trial court's fault-element determination. Before the court of appeals purported to apply the fault standard that this court announced in *Lansdowne*, 32 Ohio St.3d 176, 512 N.E.2d 979, it said:

> There is no question that WBNS defamed some of the Andersons.
> It accused members of the family of being armed robbers. * * *
> [M]erely publishing a false, defamatory statement is sufficient to
> establish a traditional defamation claim. Common law malice is
> established by the mere publication of false, defamatory material.
> The fact that WBNS failed to distribute a retraction supports the
> common law presumption of malice applicable in such situations.

2018-Ohio-761, ¶ 8. Because WBNS focused its summary-judgment argument on the fault element, the trial court confined its decision to that element, and the parties confined their arguments on appeal to the fault element. The defamatory-statement element of the defamation claim (i.e., whether the publications were defamatory) was not before the court of appeals, and that court's expression regarding WBNS's alleged defamation of Aaron, Aaronana, and Arron Anderson was not essential to

its fault-element determination. The court's statement regarding WBNS's allegedly defamatory publications was dictum and, therefore, is not the law of the case.

{¶ 12} This appeal stems from WBNS's motion for summary judgment based on only the fault element of the Andersons' defamation claim and the court of appeals' review of that decision. The question before the court of appeals was whether the trial court erred in holding that the Andersons could not prove the fault element of their defamation claim. The issue whether the publications were defamatory was not before the court.

{¶ 13} Although the court of appeals correctly stated the appropriate standard as set forth in *Lansdowne*, it ultimately applied a different standard. Actually, the court erred in two ways. It stated that "merely publishing a false, defamatory statement is sufficient to establish a traditional defamation claim," 2018-Ohio-761 at ¶ 8. This statement is plainly contrary to *Lansdowne*, which requires a showing of negligence. The court of appeals also erroneously stated that "a media outlet has a stronger duty to research the facts in such cases than it did when the *Lansdowne* case was decided." 2018-Ohio-761 at ¶ 11. The court did not cite any authority for this new standard or explain what constitutes compliance with the "stronger duty."

{¶ 14} We agree with WBNS that the standard set forth in *Lansdowne,* 32 Ohio St.3d 176, 512 N.E.2d 979, is the appropriate standard to apply in this case. We also agree that *Lansdowne* requires the Andersons to present clear and convincing evidence that WBNS acted negligently in publishing defamatory statements about Aaron, Aaronana, and Arron. And we agree that although the court of appeals correctly set forth the *Lansdowne* standard, it did not apply it. Thus, we vacate the court of appeals' judgment and remand the cause to the court of appeals for it to again consider whether the trial court properly granted summary judgment to WBNS on the Andersons' defamation claim. On remand, the court of

appeals is instructed to apply the standard set forth in *Lansdowne*. We express no opinion on the merits of this case; we remand the cause solely to allow the court of appeals to apply the appropriate standard.

{¶ 15} Because we adopt WBNS's first proposition of law and remand the cause to the court of appeals, we decline to address its other propositions of law.

Judgment vacated<br>and cause remanded.

O'CONNOR, C.J., and FRENCH, FISCHER, and STEWART, JJ., concur.

DEWINE, J., concurs in judgment only, with an opinion.

KENNEDY, J., dissents, with an opinion.

_____

**DEWINE, J., concurring in judgment only.**

{¶ 16} I did not vote to accept this case, 153 Ohio St.3d 1461, 2018-Ohio-3258, 104 N.E.3d 791, because I did not believe that it presented a significant constitutional question or an issue of public or great general interest, *see* Ohio Constitution, Article IV, Section 2(B)(2)(a)(ii) and (e); S.Ct.Prac.R. 5.02(A). In my view, the case simply involved the application of settled standards and thus called for (at most) error correction. Now that I have had the opportunity to review the record with the benefit of full briefing, that conclusion seems all the more clear.

{¶ 17} But as the case is now before us, I concur in the majority's decision to vacate the judgment of the Tenth District Court of Appeals on the fault element of the Andersons' defamation claim against WBNS-TV ("WBNS"), and to remand the case to ensure that the court applies the standard announced in *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 512 N.E.2d 979 (1987). The court of appeals may well have intended to apply that standard the first time around, but unfortunately, its gratuitous commentary obscures its analysis. Vacating the judgment and remanding the case will ensure that the appropriate standard is

applied in this case and prevent the now-vacated decision from causing confusion for future litigants.

**{¶ 18}** I would go further than the majority, however, and also resolve WBNS's fifth proposition of law by expressly vacating the Tenth District's apparent holding that WBNS's publications were defamatory, 2018-Ohio-761, ¶ 8. Doing so would address the dissenting justice's concern that the court of appeals' statement on that point might be treated as the law of the case. And it is appropriate to vacate that portion of the Tenth District's decision because the issue whether the publications were defamatory was not before the court on appeal.

**{¶ 19}** WBNS moved for summary judgment based solely on the fault element of the Andersons' defamation claim,[2] and consequently, the Andersons were never put to their burden of proof on the question whether the publications were defamatory. Thus, the only question before the trial court in the summary-judgment phase was whether WBNS acted negligently. While the trial court's analysis is somewhat muddled, I am reluctant to read it as having decided the defamatory element outright, particularly when the court explicitly expressed that its decision was confined to the fault element. Franklin C.P. No. 16CV-9809 (Aug. 21, 2017) (noting that "WBNS focuse[d] its argument solely on the fault prong" and concluding that the "plaintiffs failed to sustain their burden of establishing a genuine issue of material fact as to WBNS' negligence").

**{¶ 20}** WBNS makes this very point in its brief to this court. It complains that even though its motion for summary judgment had "assumed *arguendo* that other elements of a defamation claim were met and focused solely on the element of fault," the Tenth District "proceeded to adjudicate other elements" of the

---

2. Indeed, in its reply brief in support of its motion for summary judgment, WBNS expressly disclaimed any basis for the court to decide whether the publications were defamatory: WBNS reiterated that its motion was "based solely on the fourth element of a defamation claim" and thus asserted that an argument made by the Andersons seemingly addressing the defamatory element had "no bearing on the Motion."

defamation claim. On this procedural posture, I agree that it was improper for the Tenth District to comment that "[t]here is no question that WBNS defamed some of the Andersons," 2018-Ohio-761 at ¶ 8. Likewise, I do not think it is appropriate for us to decide that question in the first instance.

{¶ 21} I would therefore also vacate the finding of the Tenth District Court of Appeals as it relates to the defamatory element. I otherwise concur with the majority's decision vacating the Tenth District's judgment on the question of fault and remanding the case for the court to apply the standard enunciated in *Lansdowne*, 32 Ohio St.3d 176, 512 N.E.2d 979, in its review of that issue.

_____

**KENNEDY, J., dissenting.**

{¶ 22} In this case, we have a holding by the trial court that as a matter of law the publications are not defamatory, an appellate-court decision overruling that holding, and a proposition of law calling on this court to address that determination. But the majority avoids issuing a dispositive decision by focusing on a nonissue— the appellate court's supposed tinkering with the standard of fault in defamation cases. However, the Tenth District Court of Appeals did nothing to alter defamation law in this state—the "stronger duty" language in the appellate court's decision, 2018-Ohio-761, ¶ 11, is an expression of opinion separate and apart from the legal analysis in the appellate decision and is therefore obiter dictum. The majority sends this case back to the appellate court for it to apply the fault standard for private-figure defamation established in *Lansdowne v. Beacon Journal Publishing Co.*, 32 Ohio St.3d 176, 512 N.E.2d 979 (1987) (plurality opinion).[3] *Lansdowne* provides the standard for proving fault in a case involving a private-figure plaintiff and a news-media defendant: "the plaintiff must prove by clear and

_____

3. Although *Lansdowne* is a plurality opinion, the standard set forth in the case was acknowledged as the correct standard by a majority of the court in *Dale v. Ohio Civ. Serv. Emps. Assn.*, 57 Ohio St.3d 112, 114, 567 N.E.2d 253 (1991).

9

convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication." *Id.* at 180. But the appellate court has already applied that standard; it held that there is a genuine issue of fact as to whether appellant, WBNS-TV, Inc. ("WBNS"), violated its duty of care in publishing what the appellate court held was defamatory material. 2018-Ohio-761 at ¶ 8, 11.

{¶ 23} By remanding this case to the appellate court for a second application of *Lansdowne*, the majority ignores the threshold question whether the material is defamatory. The trial court granted summary judgment to WBNS on the defamation claim because it held that the Andersons had failed to sustain their burden of establishing a genuine issue of material fact as to WBNS's negligence— the trial court determined that the publications at issue lacked a defamatory character. The court of appeals, on the other hand, declared the publications defamatory before moving on to apply the *Lansdowne* test. This leaves as the law of the case the appellate court's determination that the publications at issue are defamatory. *See Nolan v. Nolan*, 11 Ohio St.3d 1, 3, 462 N.E.2d 410 (1984) ("the decision of a reviewing court in a case remains the law of that case on the legal questions involved for all subsequent proceedings in the case at both the trial and reviewing levels").

{¶ 24} But the majority—in its concentrated effort not to resolve this case— simply wishes away the law-of-the-case problem by declaring without analysis that any holdings regarding the defamatory character of the publications by the lower courts are dicta. The majority thereby treats what is substantive as dictum and what is dictum as substantive. It illogically holds that anything that touches on the defamatory nature of the publications in this case is dictum while simultaneously elevating that which is truly dictum—the appellate court's after-the-holding pontification about the role of media in a digital society—to the level of something substantive. It does all of this only to arrive at its hollow holding remanding the

case to the appellate court for its reapplication of the *Lansdowne* standard. In so doing, the majority is able to wash its hands of a messy case, achieving nothing other than causing further delay in resolving the matter and additional expense for the litigants.

{¶ 25} What this court should do first is determine whether the appellate court's determination that the publications are defamatory is correct. And only if this court determines that that determination is correct should this court go on to determine whether the appellate court's application of the fault standard established in *Lansdowne* to the facts of this case is correct. If there is no defamatory content in the publications, there is no reason to employ the *Lansdowne* test.

{¶ 26} Applying the standard established in *Am. Chem. Soc. v. Leadscope, Inc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, ¶ 79, for determining whether a statement is defamatory—in other words, reviewing the totality of the circumstances and evaluating the allegedly defamatory statements in the context of the entire publication in which they appeared to determine whether a reasonable person would interpret them to be defamatory—I would hold that the statements at issue are not defamatory. That is, construing the publications from the perspective of a person viewing a "crime-stoppers" report stating that the Columbus Police Department ("CPD") was seeking information from the community to solve an armed-robbery case, a reasonable viewer would not interpret the publications as defamatory. Therefore, I would reverse the appellate court's judgment and reinstate the trial court's order granting summary judgment to WBNS. Because the majority does otherwise, I dissent.

**We Should Decide this Case on the Merits**

{¶ 27} Because there is a potentially dispositive issue that lies before us—whether the publications are defamatory—we should decide that issue. The trial court's and appellate court's determinations on that issue were not dicta; instead, they were essential to their holdings in each instance. Further, despite the

majority's contention, there is no reason to remand this case to the appellate court—it has already applied the standard the majority believes it should apply. As set forth below, the statements the majority identifies as problematic in the court of appeals' decision regarding the fault standard *are* obiter dicta, as they address an issue not in play in the appeal. Moreover, the appellate court clarified in its rejection of an application for an en banc hearing that it was establishing no new standard in its decision. Finally, a remand to the appellate court will result in a waste of judicial resources and unnecessary expenses to the parties.

*The trial court's determination that the publications*

*were not defamatory is not dictum*

{¶ 28} The trial court's holding that the publications in this case were not defamatory is the central determination around which this case revolves. That holding was not dictum—"[a] judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case * * *," *Black's Law Dictionary* 1240 (10th Ed.2014). The trial court's holding was dispositive, and the appellate court's judgment overruling the trial court on that issue should be the focus of this court's review.

{¶ 29} The majority's declaration that the holdings of the trial court and appellate court are dicta ignores what happened in this case. Members of the Anderson family[4] allege that WBNS defamed them in broadcast and Internet reports regarding the robbery of a hoverboard from a young girl; WBNS based its reports on information provided by the CPD in an e-mail containing a Media Information Sheet and accompanying photographs, and WBNS's reports included a CPD-provided picture of three Anderson family members near the scene of the

---

4. Aaron, Aaronana, and Arron Anderson are the three people allegedly defamed by WBNS. Appellees in this case are Aaron, Aaronana, and Willie Anderson (the father of Aaron, Aaronana, and Arron Anderson), individually and as guardian of Arron, and Nanita Williams (the mother of Aaron, Aaronana, and Arron Anderson), individually and as guardian of Arron (collectively, "the Andersons").

crime. A central issue before the trial court was whether WBNS negligently altered the information provided by the CPD and thereby defamed the three Andersons. Examining the publications and recognizing that under *Am. Chem. Soc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, the words at issue in the publications could not be read in isolation, the trial court viewed the alterations in context to determine whether the material published by WBNS was defamatory. Thereafter, the most essential holding of the trial court was that the alteration of the word "suspects" in the CPD-provided media information to "robbers" in WBNS's reports did not make the publications defamatory and therefore the Andersons failed to meet their burden of demonstrating that a genuine issue of material fact existed on the issue of fault.

{¶ 30} The trial court's determination that the publications at issue here were not defamatory was not an off-the-cuff musing or some gratuitous expression made without any legal analysis or consideration of the consequences. The determination was not superfluous to the determination of the motion for summary judgment; instead, it was the basis for the trial court's granting the motion for summary judgment after carefully and systematically applying the appropriate caselaw.

{¶ 31} In its motion for summary judgment, WBNS argued that to successfully prosecute a defamation claim against a broadcast-media defendant, a plaintiff must prove four elements: (1) a false statement was made about the plaintiff, (2) the statement was defamatory, (3) the statement was broadcast by television or radio or written and published, and (4) in broadcasting or publishing the statement, "the defendant acted with the necessary degree of fault." (Emphasis deleted.) *See also Am. Chem* at ¶ 77 (listing these same four elements and a fifth element—injury to plaintiff—as those necessary to prove a defamation claim).

{¶ 32} For the purposes of its motion for summary judgment, WBNS concentrated on the fourth element of a claim for defamation, fault. WBNS pointed

to *Lansdowne* as providing the standard for proving fault in a case involving a private-figure plaintiff and a news-media defendant: "the plaintiff must prove by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication," *id.*, 32 Ohio St.3d at 180, 512 N.E.2d 979.  Focusing on only the fault element of the defamation test, WBNS argued that the Andersons could not establish by clear and convincing evidence that WBNS had acted with the necessary degree of fault.

{¶ 33} The trial court granted summary judgment in favor of WBNS.  In addressing the defamation claim, the court, too, focused on the fault element of the defamation test, analyzing two theories of negligence advanced by the Andersons—(1) WBNS failed to investigate the information from the CPD and (2) WBNS altered the information from the CPD.  In support of those theories, the Andersons presented little evidence.  "A motion for summary judgment forces the nonmoving party to produce evidence on any issue for which that party bears the burden of production at trial." *Wing v. Anchor Media, Ltd. of Texas*, 59 Ohio St.3d 108, 570 N.E.2d 1095 (1991), paragraph three of the syllabus.  The Andersons submitted (1) WBNS's Facebook post about the robbery with accompanying commentary from the public, (2) a few interrogatory answers from WBNS establishing that it had no set procedure for verifying information provided by the CPD and that WBNS was unable to determine which staff member had written the Facebook story, and (3) affidavits from Aaron and Willie Anderson describing what had happened from their perspective and the injuries they and their family members had suffered.

{¶ 34} The Andersons' first theory of negligence was that WBNS was negligent in failing to investigate the information provided by the CPD.  Quoting *Horvath v. Telegraph*, 11th Dist. Lake No. CA-8-175, 1982 Ohio App. LEXIS

15776, *27 (Mar. 8, 1982), the trial court rejected that theory, concluding that WBNS had reasonably relied on the CPD reports:

> [I]mposing a duty of investigation on WBNS when it reasonably relied on information from law enforcement officials "would * * * depriv[e] the general public of news to which they are entitled and to place intolerable burdens and costs upon a publisher." * * * Because plaintiffs have not demonstrated by clear and convincing evidence that WBNS acted negligently, summary judgment in WBNS' favor is proper on [the Andersons'] defamation count.

(First ellipsis and second set of brackets sic.)

{¶ 35} The Andersons' second theory of negligence was that WBNS was negligent in altering the characterization of Aaron, Aaronana, and Arron from "suspects" in the Media Information Sheet to "robbers" in WBNS's stories. In analyzing this theory, the trial court focused on two issues: whether a case cited by the Andersons supported their claim and whether the alteration caused the publications to be defamatory. The Andersons offered no evidence on the issue of negligent alteration—no expert opinion that WBNS had acted unreasonably by industry standards; the only evidence the court had before it was the publications themselves and the CPD-provided materials.

{¶ 36} In support of their argument, the Andersons cited *Young v. Morning Journal*, 76 Ohio St.3d 627, 669 N.E.2d 1136 (1996). But the trial court held that *Young* was inapposite because it is premised on the fair-reporting privilege and that privilege was not at issue in the case.

{¶ 37} The trial court then—pursuant to *Lansdowne*'s instruction to determine whether the publisher of the material reasonably attempted to discover the defamatory character of the publication—specifically addressed whether the

publications were defamatory. Noting that courts do not look at allegedly defamatory statements in a vacuum, the trial court held as a matter of law that the material published by WBNS was not defamatory. In reaching that determination, the trial court correctly identified the standard set forth in *Am. Chem. Soc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, at ¶ 79, and quoted the following language from that case:

> "In determining whether a statement is defamatory as a matter of law, a court must review * * * the totality of the circumstances" and by "read[ing] the statement[] * * * in the context of the entire [publication] to determine whether a [reasonable] reader would interpret [it] as defamatory." *Mann v. Cincinnati Enquirer,* 1st Dist. No. C-090747, 2010-Ohio-3963, ¶ 12.

(Ellipses and brackets sic.) *Id.*

{¶ 38} The trial court then applied that standard and made a specific legal determination. In accord with *Am. Chem Soc.*, the court turned to the publications themselves, the only evidence it had before it regarding the claim for negligence in altering the CPD information:

> It is true that the broadcast contained the word "robbers" and the internet story had "robbers" in the headline. However, the morning show used both the Parking Lot and Hall Photographs. It also characterized plaintiffs as suspects while showing the Hall Photograph. And, the posting also used "suspects" throughout the body of the story. Within this complete context, the Court cannot conclude that a reasonable reader or viewer would interpret the stories as defamatory.

**{¶ 39}** The trial court therefore concluded that WBNS was entitled to judgment as a matter of law on the theory of negligence premised on WBNS's alteration of "suspects" in the CPD-provided information to "robbers" in WBNS's reports because the alterations did not make the publications defamatory when the alterations were viewed in the context of the whole publication in accord with *Am. Chem. Soc.* The trial court held:

> In sum, plaintiffs failed to sustain their burden of establishing a genuine issue of material fact as to WBNS' negligence. The Court thus concludes that: (1) there is no genuine issue as to any material fact; (2) WBNS is entitled to judgment as a matter of law; and (3) reasonable minds can come to but one conclusion, and that conclusion is adverse to the plaintiffs.

**{¶ 40}** The *Lansdowne* standard requires the plaintiff to "prove by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity *or defamatory character of the publication*." (Emphasis added.) *Id.*, 32 Ohio St.3d at 180, 512 N.E.2d 979. The trial court based its decision on its conclusion that the Andersons had failed to sustain their burden to demonstrate that the published material was defamatory. And if a plaintiff cannot prove defamatory content, his or her claim for defamation fails. The trial court's holding on the defamatory nature of the publications was therefore not dictum— "[a] judicial comment * * * that is unnecessary to the decision in the case * * *," *Black's* at 1240. To the contrary, it was the very basis of the court's decision on the defamation claim and the opposite of dictum.

*The appellate court's determination that the publications*
*were defamatory is not dictum*

{¶ 41} The appellate court realized the import of the trial court's determination that the publications were not defamatory, and it reversed that ruling and held that the publications were defamatory before moving on to the next inquiry—whether WBNS had acted negligently. It simply held, "There is no question that WBNS defamed some of the Andersons," and then moved on. 2018-Ohio-761 at ¶ 8. The appellate court's determination that the publications are defamatory was crucial to its holding and thus was not dictum. Without that determination, the appellate court's application of *Lansdowne* would have been a meaningless exercise.

{¶ 42} The Andersons appealed the trial court's judgment, asserting one assignment of error: the trial court improperly granted WBNS summary judgment on the defamation claim because the Andersons had provided clear and convincing evidence of WBNS's negligence. The Andersons supported that assignment of error with two arguments acknowledging that the CPD was a reliable source and asserting that it was WBNS's "significant alteration" or "significant changes" of the information received from the CPD that constituted clear and convincing evidence of negligence.

{¶ 43} At first blush—just reading the single assignment of error—one might conclude that the Andersons abandoned an appeal of the trial court's determination that WBNS was entitled to summary judgment because the alteration of "suspects" to "robbers" when read in the context of the whole publication could not be interpreted as defamatory by a reasonable reader or viewer; however, such a conclusion would be inconsistent with our precedent.

{¶ 44} Although the general rule is that "this court will not consider arguments that were not raised in the courts below," *Belvedere Condominium Unit Owners' Assn. v. R.E. Roark Cos., Inc.*, 67 Ohio St.3d 274, 279, 617 N.E.2d 1075

(1993), *modified in part on other grounds, Dombroski v. WellPoint, Inc.*, 119 Ohio St.3d 506, 2008-Ohio-4827, 895 N.E.2d 538, syllabus, this court has stated, "When an issue of law that was not argued below is implicit in another issue that was argued and is presented by an appeal, we may consider and resolve that implicit issue," *id.*

{¶ 45} The Andersons alleged in their appellate-court brief that "[t]his case involves an undisputed defamatory statement, about private individuals, that was negligently altered prior to publication." Implicit in the Andersons' argument is that it was WBNS's alteration of the CPD-provided information that made it defamatory. The Andersons further alleged, "This alteration is the difference between the police *knowing* Appellants committed a robbery but not knowing their identity, versus the police *suspecting* Appellants involvement in a robbery. The former leaves little room for the potential innocence of Appellants." (Emphasis sic.) The issue whether the alteration was defamatory was squarely before the court, and only if the alteration made the character of the publication defamatory could the negligence issue be addressed. Therefore, the Andersons' only chance for relief would require a determination that the alteration made the reported information defamatory.

{¶ 46} The appellate court provided that chance; its first step in reversing the trial court was to declare the publications defamatory:

> There is no question that WBNS defamed some of the Andersons. It accused members of the family of being armed robbers. * * * [T]his is not a case involving public figures, so merely publishing a false, defamatory statement is sufficient to establish a traditional defamation claim.

2018-Ohio-761 at ¶ 8.  However, unlike the trial court, which applied *Am. Chem. Soc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, in reaching the determination that the publications were not defamatory, the appellate court did not consider whether a reasonable reader or viewer construing each publication as a whole would interpret it as defamatory.  Nonetheless, its determination, too, was critical to its holding.  Thereafter, the appellate court applied the fault standard in *Lansdowne*, 32 Ohio St.3d 176, 512 N.E.2d 979.  In doing so, the appellate court revived the Andersons' claims for defamation.

{¶ 47} And because the majority here remands the case to the appellate court to apply the fault standard established in *Lansdowne* without addressing WBNS's fifth proposition of law—the proposition concerning the defamatory nature of the publications—it leaves undisturbed the appellate court's determination that the publications are defamatory.  That portion of the appellate decision becomes the law of the case.  Pursuant to the law-of-the-case doctrine,

> a trial court is without authority to extend or vary the mandate issued by a superior court, [*Nolan*, 11 Ohio St.3d] at 4, 462 N.E.2d 410, and "where at a rehearing following remand a trial court is confronted with substantially the same facts and issues as were involved in the prior appeal, the court is bound to adhere to the appellate court's determination of the applicable law," *id.* at 3.

*Giancola v. Azem*, 153 Ohio St.3d 594, 2018-Ohio-1694, 109 N.E.3d 1194, ¶ 16.  This court has not reversed the appellate court's holding that WBNS's publications are defamatory, and that holding, pursuant to the law-of-the-case doctrine, should be binding on the court of appeals and the trial court upon remand.

{¶ 48} But the majority concocts from thin air a way around that holding's being the law of the case: it proclaims that the trial court's and the appellate court's

holdings regarding the defamatory nature of the publications are dicta. This conclusion is based upon no authority; it is merely what the majority desires to be true. Such a holding should come by way of precedent and reason, not judicial diktat. But there is no precedent that says that a court's holding on an essential element of a claim is dictum, and there is no reasonable way to argue that it can be.

*The "stronger duty" language in the appellate opinion* is *obiter dictum*

{¶ 49} But the majority's misguided analysis of this case gets worse. When it comes to the application of the *Lansdowne* test, the majority attacks a straw man—the lower court establishes no new standard and announces no new test for determining fault in private-figure defamation cases involving media defendants. However, the majority determines that the "stronger duty" language in the appellate opinion *does* establish a new fault standard in private-figure defamation cases, and it remands the case for further proceedings consistent with *Lansdowne*.

{¶ 50} Pursuant to *Lansdowne*, "the plaintiff must prove by clear and convincing evidence that the defendant failed to act reasonably in attempting to discover the truth or falsity or defamatory character of the publication." *Id.*, 32 Ohio St.3d at 180, 512 N.E.2d 979. The appellate court set forth the *Lansdowne* standard as follows: "The Supreme Court of Ohio has provided some protection from liability for media outlets by requiring that persons defamed by the media show some fault on the part of the media and make that showing by clear and convincing evidence." 2018-Ohio-761 at ¶ 9. The court then distilled the case to the following issue, consistent with *Lansdowne*:

> For purposes of the lawsuit filed by the Andersons, the question becomes whether or not broadcasting an accusation that the Andersons were robbers without investigation by WBNS and based on a set of police documents which claimed only that some of the Andersons were suspects is sufficient proof of a violation of a duty

of care to allow the lawsuit to survive a motion for summary judgment.

2018-Ohio-761 at ¶ 11. In the next sentence, the court provided its holding: "We find that the lawsuit at least presents a genuine issue of material fact which allows the lawsuit to proceed past the motion for summary judgment filed by WBNS." *Id.*

{¶ 51} It is *after* this pronouncement that the "stronger duty" language appears in the opinion, along with other nonessential extras that seem to question WBNS's professionalism rather than its liability. The court of appeals opined that

> putting such false claims on a website means that the falsely accused have the accusation available to anyone who chooses to do a search of the internet forever. WBNS has not printed a story correcting its false accusations or put notice on the internet that it falsely accused the family. Frankly, a media outlet has a *stronger duty to research* the facts in such cases than it did when the *Lansdowne* case was decided. False stories on the internet do not simply disappear because the truth is later discovered.

(Emphasis added.) *Id.*

{¶ 52} This passage in the opinion appears well *after* the appellate court's determination that "[t]here is no question that WBNS defamed some of the Andersons." *Id.* at ¶ 8. And it appears after the appellate court's recognition of the limited question before it: "The assignment of error filed on behalf of the Andersons refers to negligence on behalf of WBNS *as now required by the Supreme Court of Ohio*." (Emphasis added.) *Id.* at ¶ 10.

{¶ 53} "Obiter dictum" is defined as " 'an incidental and collateral opinion uttered by a judge, and therefore (as not material to his decision or judgment) not

binding. * * * Hence, any incidental remark, reflection, comment, or the like.' " *State ex rel. Gordon v. Barthalow*, 150 Ohio St. 499, 505-506, 83 N.E.2d 393 (1948), quoting *Webster's New International Dictionary* (2d Ed.). The appellate court signaled that its commentary was merely an aside when it used the word "frankly" to introduce what it was about to say about a "stronger duty." 2018-Ohio-761 at ¶ 11. What followed was mere gavel-rattling. The appellate court's editorializing and commentary, while eye-catching, does not carry with it any weight of authority overruling our precedent in *Lansdowne* or creating a new duty or fault standard in private-figure defamation cases. *See Interstate Sash & Door Co. v. Cleveland*, 148 Ohio St. 325, 74 N.E.2d 239 (1947) (obiter dictum has no weight of authority). The court of appeals set forth the issue before it, quickly established its holding, and then began pontificating. The majority has now attached jurisprudential significance to bloviation.

*What the "stronger duty" language in the appellate opinion*

*addresses is not at issue*

{¶ 54} Moreover, the "stronger duty" phrase relates to the word "research": "Frankly, a media outlet has a *stronger duty to research* the facts in such cases * * *." (Emphasis added.) 2018-Ohio-761 at ¶ 11. However, the Andersons did not appeal from the trial court's determination that WBNS could rely on the information from the CPD as information from a trusted source and that WBNS had no duty to investigate the information. There was only one assignment of error before the appellate court—" 'The trial court erred in granting [WBNS's] motion for Summary Judgment on [the Andersons'] defamation claim where [the Andersons'] provided clear and convincing evidence of [WBNS's] negligence.' " *See* 2018-Ohio-761 at ¶ 1, quoting the Andersons' brief.

{¶ 55} The Andersons supported that assignment of error with two arguments. Each of the arguments acknowledges that the CPD was a reliable source and asserts that it was WBNS's "significant alteration" or "significant

changes" of the information received from the CPD that constitute clear and convincing evidence of negligence. The headings of these arguments read:

> In [the Andersons'] private defamation claim, [WBNS's] *significant alteration of reliable source information* is clear and convincing evidence of negligence.
>
> Authority advanced by [WBNS] fails to address liability for *significant changes in reliable source information* prior to publication.

(Emphasis added.)

**{¶ 56}** Therefore, the court of appeals stated that the issue before it was "[w]hether [WBNS's] alteration in referring to [the Andersons] as 'robbers,' when the [CPD had] supplied information referring to 'suspects,' is clear and convincing evidence sufficient to raise a jury question as to the fault element of [the Andersons'] claim for defamation." 2018-Ohio-761 at ¶ 2. Accordingly, the appellate court's words regarding WBNS's duty to *investigate* were not material to the judgment and were therefore dicta.

*The court of appeals left no doubt in its subsequent opinion*

*that it had not modified* Lansdowne

**{¶ 57}** Moreover, in addressing WBNS's application for rehearing en banc, the appellate court specifically stated that it had created no new law in its decision and that it had relied on *Lansdowne*, 32 Ohio St.3d 176, 512 N.E.2d 979, only. WBNS's application for rehearing alleged that the appellate court had failed to apply the private-figure fault standard announced in *Lansdowne*. The appellate court denied the application for rehearing en banc, holding that it had not failed to follow *Lansdowne* ("We do not view our decision in this case as in any way failing to follow the *Lansdowne* case," 10th Dist. Franklin No. 17AP-660 (Apr. 24, 2018),

¶ 3) and that its decision was not in conflict with its prior decisions that had applied *Lansdowne*. The court of appeals made clear in its denial of the rehearing motion what was apparent from the face of its original decision: it was not making the Tenth Appellate District an outlier in the state and in the nation regarding defamation law. Rather, it had been editorializing, and there could be no danger that the trial court would apply the wrong fault standard upon remand.

*Remand to the appellate court is unnecessary*

{¶ 58} Even the Andersons, in their brief filed in this court, characterize the "stronger duty" language as evidence of the "judge['s] outrage[]" at the egregiousness" of WBNS's violation of the negligence standard and as an admonition to media outlets regarding "their responsibility in light of the internet," and assert that the offending passage is merely dicta.

{¶ 59} The Andersons also assert that they have "*never argued*" for a heightened standard of fault for Internet publications or for the abrogation of *Lansdowne*. (Emphasis sic.) Moreover, the Andersons agree that the standard of fault in a private-figure defamation claim is controlled by *Lansdowne*. Therefore, the superfluous commentary from the appellate court in its opinion should not stop this court from resolving the discretionary appeal we accepted.

{¶ 60} Civ.R. 56 authorizes courts to grant summary judgment. The rule was created to promote "judicial economy through elimination of needless trials in circumstances where there are no genuine issues of material fact." *State ex rel. Celebrezze v. Tele-Communications, Inc.*, 62 Ohio Misc.2d 446, 448, 601 N.E.2d 260 (Ct. of Cl.1991). Rather than decide whether summary judgment is appropriate and possibly resolve this case, the majority instead remands this case for a superfluous additional level of appeal, to the detriment of judicial economy.

{¶ 61} Affording the appellate court's dicta its proper authoritative value, none, I would reject WBNS's second proposition of law—alleging that the appellate court created a new "stronger duty" fault standard—and turn to a review

of the appellate court's determination that the publications at issue here are defamatory.

**Facts**

{¶ 62} These facts are not in dispute. On January 20, 2016, at 11:02 p.m., Luella Miller of the CPD sent a Media Release e-mail containing a Media Information Sheet and two pictures to a host of individuals and media outlets. The information contained in the Media Release e-mail and its attachments had been submitted by a detective of the robbery unit and had been approved for release by a sergeant prior to its dissemination.

{¶ 63} The subject line of the Media Release e-mail reads: "FW: Media Release – Robbery – Fort Rapids-4565 Hilton Corporation Drive." The attachment line of the Media Release e-mail reads: "09 Leaving Waterpark.png; 08 Two Guy [sic] Rob Kid in front of Parents.png; Media Release – Robbery * * *." The attached Media Information Sheet is dated January 10, 2016, and lists the offense or incident type as "Robbery." The Media Information Sheet also describes the incident and asks for help in identifying the people in the photographs:

> The victims were walking in the parking lot of Fort Rapids waterpark watching their eight year old daughter ride her "hoverboard." The suspects approached on foot, put a gun to the eight-year-old's head and demanded the hoverboard. The suspects then ran to a white PT cruiser and fled out of the parking lot.
>
> Anyone that can help identify the persons in the attached photographs who may have been involved are asked to contact the Columbus Police Robbery Unit at 614-645-4665. If they wish to remain anonymous [they] can contact Central Ohio Crime Stoppers at 614-645-TIPS (8477).

{¶ 64} One of the pictures disseminated with the Media Release e-mail is grainy and depicts the parking lot of the Fort Rapids indoor waterpark at the time of the robbery ("parking-lot photograph"). In that photograph, there are several people standing under a light, but the image is not clear, and the people are not identifiable. The parking-lot photograph is dated and time-stamped November 26, 2015, 9:47:19 p.m.

{¶ 65} The second picture, which is a still shot taken from a surveillance video, is an interior view of the Fort Rapids indoor waterpark and it shows three people, two males and one female, walking in a hallway ("interior photograph"). This interior photograph is clear enough that the people are identifiable. The three people in the interior photograph are Aaron, Aaronana, and Arron Anderson. The picture is dated and time-stamped November 26, 2015, 9:25:44 p.m.

{¶ 66} Michael Gravely, the assignment manager in the news department of WBNS, testified by affidavit that the CPD did not provide any names for the people in the interior photograph and no one on staff at WBNS had information about their identity. The WBNS news staff reviewed the Media Release e-mail and the attachments and rewrote the information as a news story for WBNS's regular "CrimeTracker 10" news feature to air the next morning. The stories aired during the 5:00 a.m. and 6:00 a.m. broadcasts on January 21, 2016. A written story was also posted on WBNS's webpage and Facebook page ("Web reports").

{¶ 67} The record does not contain recordings of the broadcasts but does contain copies of the scripts for the broadcasts. The script for the 5:00 a.m. broadcast reads:

> New this morning
> * * *
> An 8-year-old girl robbed at gunpoint—for a popular toy.

27

The robbery happened in the parking lot of Fort Rapids indoor waterpark back in November.

You can see the scene in these just-released surveillance images.

The girl was riding her hoverboard when robbers went up to her, put a gun to her head and took it. Columbus Police say suspects—seen here—took off in a PT cruiser.

The picture displayed when the newscaster said "seen here" was the interior photograph.

{¶ 68} The script for the later broadcast reads:

IN CRIMETRACKER 10,

* * * [Notes: show suspect pic]

Columbus Police hope you recognize these two men who robbed an 8-year-old girl at gunpoint!

It happened in the parking lot of Fort Rapids indoor waterpark in Columbus. [Notes: show parking lot photo]

Robbery detectives just released surveillance images from the November crime.

The girl was riding her hoverboard in the parking lot with her family when they say two men pointed a gun at her head, taking it. .

[Notes: show suspect pic]

Columbus Police say suspects—seen here—took off in a PT cruiser.

(Capitalization and brackets sic.)  Again, the picture displayed at the beginning of the broadcast and during the "seen here" portion was the interior photograph.

{¶ 69} The written publication was posted on WBNS's webpage and Facebook page with the headline, "Robbers Put Gun To Child's Head And Steal Hoverboard."  (Boldface deleted.)  The body of the story stated:

Columbus police are searching for two men who robbed a child at gunpoint in east Columbus.

It happened Sunday, November 26, 2015 outside Fort Rapids Water Park around 10 PM.

Police say the victim was riding her hoverboard while in the parking lot with her family when they were approached by two men. The suspects put a gun to the 8-year-old-girl's head and demand[ed] the toy.

When she handed it over, the two men ran to a white PT Cruiser and took off.

Investigators say there was a woman with the two male suspects.  They are not sure how she is connected to the robbery.

No one was injured during the robbery.

If you have any information about this incident, call Columbus Police at 614-645-4665 or make an anonymous tip to Central Ohio Crime Stoppers at 614-645-TIPS (8477).

{¶ 70} When the online publication was originally posted, the interior photograph was displayed with it.

{¶ 71} On January 21, 2016, at 5:15 a.m., Willie Anderson received a call at work from his wife, Nanita Williams, about the newscast.  Mr. Anderson left

work and took his wife and children (Aaron, Aaronana, and Arron) to the police station.

{¶ 72} As a result of the CPD's follow-up investigation, including interviewing the Anderson family, Carmel Wilson of the CPD sent an e-mail with the subject line "Important Update." Attached to the e-mail was an Updated Media Information Sheet on the robbery. It contained the same information concerning the robbery itself, but included the following:

Follow-Up and Update: Following the news coverage, the individuals in the video immediately came into Columbus Police Headquarters. The individuals in the video spoke to detectives, and, after further investigation, were found to not be the suspects in the robbery. Please discontinue the use of this video for any further reporting of this crime.

{¶ 73} WBNS received the investigation update on January 21, 2016, at approximately 12:25 p.m. Gravely immediately removed the interior photograph from the Web reports and replaced it with the grainy parking-lot photograph. After the original broadcasts, WBNS did not make any further on-air broadcasts about the waterpark robbery. On August 5, 2016, counsel for the Andersons sent WBNS a letter asking for a correction/retraction of the photograph.

**Procedural History**

{¶ 74} In October 2016, the Andersons filed in the Franklin County Court of Common Pleas a complaint against WBNS alleging invasion of privacy/false light, defamation of character, intentional infliction of emotional distress, violation of R.C. 2739.14 (which requires newspaper companies that have published false statements to publish corrections when requested by the people affected by the statement), and loss of consortium. WBNS's motion for summary judgment was

granted as to all five claims. The Andersons appealed only the judgment on their defamation claim, and the court of appeals reversed.

{¶ 75} This court accepted jurisdiction over all six of WBNS's propositions of law, including one asserting that the publications were not defamatory. As stated above, I would reject WBNS's second proposition of law; WBNS's remaining propositions of law are as follows:

> 1. First Amendment protections and jurisprudence extend to speech published on the Internet, and, specifically, this Court's decision in *Lansdowne* * * *, which set the fault standard in private-figure defamation cases, applies equally to statements published on the Internet.
>
> 3. The law does not require the news media to conduct their own investigation or withhold publishing the news until they are able to contact the persons implicated or otherwise inquire into and corroborate official information supplied by law enforcement.
>
> 4. Persons are not liable under the law of defamation for statements that they do not publish or authorize another to publish.
>
> 5. In determining whether a statement is defamatory, a court must review the totality of the circumstances and by reading the statement in the context of the entire publication to determine whether a reasonable reader would interpret it as defamatory.
>
> 6. The essential elements of a defamation claim do not turn on the relative financial condition of the plaintiff and defendant.

{¶ 76} Because this case can and should be resolved by addressing WBNS's fifth proposition of law, which requires a straightforward application of *Am. Chem.*

*Soc.*, 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, to the publications at issue here, I would decline to address the remaining propositions of law.

**Law and Analysis**

*Standard of review*

**{¶ 77}** When reviewing a ruling on a motion for summary judgment, the court applies a de novo standard of review. *Esber Beverage Co. v. Labatt USA Operating Co., L.L.C.,* 138 Ohio St.3d 71, 2013-Ohio-4544, 3 N.E.3d 1173, ¶ 9. Summary judgment is appropriate when

> "(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party."

*M.H. v. Cuyahoga Falls,* 134 Ohio St.3d 65, 2012-Ohio-5336, 979 N.E.2d 1261, ¶ 12, quoting *Temple v. Wean United, Inc.,* 50 Ohio St.2d 317, 327, 364 N.E.2d 267 (1977), citing Civ.R. 56(C).

*Elements of a defamation claim*

**{¶ 78}** To establish defamation, the plaintiff must demonstrate

> "(1) that a false statement of fact was made, (2) that the statement was defamatory, (3) that the statement was published, (4) that the plaintiff suffered injury as a proximate result of the publication, and (5) that the defendant acted with the requisite degree of fault in publishing the statement."

*Am. Chem. Soc.* At ¶ 77, quoting *Pollock v. Rashid,* 117 Ohio App.3d 361, 368, 690 N.E.2d 903 (1996).

{¶ **79**} Defamation includes both libel and slander. *Lawson v. AK Steel Corp.*, 121 Ohio App.3d 251, 256, 699 N.E.2d 951 (1997). Defamation by a television broadcast is libel, whether or not it is read from a manuscript. 3 Restatement of the Law 2d, Torts, Section 568A (1977); *see Perez v. Scripps-Howard Broadcasting Co.*, 35 Ohio St.3d 215, 520 N.E.2d 198 (1988).

{¶ **80**} A publication is defamatory if it "reflect[s] injuriously on a person's reputation, or expos[es] a person to public hatred, contempt, ridicule, shame or disgrace, or affect[s] a person adversely in his or her trade, business or profession." *A&B—Abell Elevator Co., Inc. v. Columbus/Cent. Ohio Bldg. & Constr. Trades Council*, 73 Ohio St.3d 1, 7, 651 N.E. 2d 1283 (1995). In regard to whether a publication is defamatory, "it is for the court to decide as a matter of law whether certain statements alleged to be defamatory are actionable or not." *Yeager v. Local Union 20, Teamsters, Chauffeurs, Warehousemen & Helpers of Am.,* 6 Ohio St.3d 369, 372, 453 N.E.2d 666 (1983). In making that determination, a court must review the totality of the circumstances and view the statement in the context of the entire publication in order to determine whether a reasonable person would interpret the statement as defamatory. *Am. Chem. Soc.* at ¶ 79.

{¶ **81**} The appellate court, in determining that the publications are defamatory, focused on WBNS's use of the term "robbers" instead of "suspects" without applying the totality-of-the-circumstances standard set forth in *Am. Chem. Soc.* As the Andersons succinctly stated in their brief before this court, "The only issue becomes whether, considering the entire context of the publication, 'a [reasonable] reader would interpret [the publication] as defamatory.' *Am. Chem. Soc.,* 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, at ¶ 79." (Brackets sic.) In holding that the publications are defamatory, the appellate court focused

on WBNS's use of the term "robbers" instead of "suspects." I limit my review to that determination.

*No genuine issue of material fact exists as to whether*

*the publications are defamatory*

{¶ 82} In a libel action, the publication " 'claimed to be defamatory must be read and construed in the sense which the readers to whom it is addressed would ordinarily understand it.' " *Washington Post Co. v. Chaloner*, 250 U.S. 290, 293, 39 S.Ct. 448, 63 L.Ed. 987 (1919), quoting *Commercial Publishing Co. v. Smith*, 149 F. 704, 706 (6th Cir.1907). A reviewing court should consider

> not only the plain text of the publication, but also the composition of the story; its syntax and context; its timing; the prominence the [publication was] accorded * * *; the neutral, positive or negative thrust of the [publication]; material factual omissions or distortions; the image of the subject that the publication seeks to project and all other facts that may reflect upon the publisher's intent and purpose to publicly disseminate the information * * *. [Moreover, a court should be] always mindful of the caveat that the words of the publication should not be considered in isolation, but rather within the context of the entire [publication] and the thoughts that the [publication] through its structural implications and connotations is calculated to convey to the [viewer] to whom it is addressed.

*Connaughton v. Harte Hanks Communications, Inc.*, 842 F.2d 825, 840 (6th Cir.1988), *aff'd* 491 U.S. 657, 109 S.Ct. 2678, 105 L.Ed.2d 562 (1989). This court has similarly determined that a court must review the totality of the circumstances and view the statement in the context of the entire publication in order to determine

whether a reasonable person would interpret the statement as defamatory. *Am. Chem. Soc.* at ¶ 79.

{¶ 83} The publications at issue in this case were presented to viewers as crime-stoppers reports—reports produced when the police enlist the media to publicize the details of a crime in the hope that the viewing public can provide information that will help solve the crime.[5] Therefore, the alleged defamatory publications must be viewed and construed from the perspective of a viewer watching or reading a crime-stoppers report.

{¶ 84} A viewer watching or reading the crime-stoppers reports at issue here would understand that the information being viewed was about an ongoing police investigation into an unsolved crime and that the CPD was turning to the community to obtain tips or information about the robbery and the identity of unknown robbery suspects. The reports themselves make clear that they result from uncertainty.

{¶ 85} Viewers would not mistake these crime-stoppers reports for news reports about an arrest or conviction of a robber and would understand that persons of interest or suspects were being sought for questioning in the robbery. Moreover, viewers would understand that the dissemination of the publications was a public service for the protection of the community as a whole.

{¶ 86} With this understanding, I turn to the 5:00 a.m. news broadcast:

> New this morning
> * * *
> An 8-year-old girl robbed at gunpoint—for a popular toy.

---

5. Central Ohio Crime Stoppers is an entity that offers rewards for anonymous tips. I use the term "crime-stoppers reports" generically to refer to publications that result from the police soliciting media outlets to release the facts of crimes to the public and to ask for the public's help in solving the crimes.

> The robbery happened in the parking lot of Fort Rapids indoor waterpark back in November.
>
> You can see the scene in these just-released surveillance images.
>
> The girl was riding her hoverboard when robbers went up to her, put a gun to her head and took it. Columbus Police say suspects—seen here—took off in a PT cruiser.

When the entire broadcast is construed from the perspective of a reasonable viewer watching a crime-stoppers report, the broadcast is not defamatory.

{¶ 87} The publication is an accurate reflection of the information that WBNS received from the CPD: an eight-year-old girl was robbed at gunpoint for a hoverboard; during the commission of the robbery, the robbers placed a gun against the child's head; when the robbery was complete, the robbers left in a PT Cruiser.

{¶ 88} Viewing the entire publication—its plain text, its composition, its neutral thrust, its factual accuracy, its intent and purposes, and its implications and connotations—reasonable minds can come to but one conclusion and that conclusion is that the publication is not defamatory.

{¶ 89} The 6:00 a.m. news broadcast also included the crime-stoppers report:

> IN CRIMETRACKER 10,
> * * * [Notes: show suspect pic]
> Columbus Police hope you recognize these two men who robbed an 8-year-old girl at gunpoint!
>
> It happened in the parking lot of Fort Rapids indoor waterpark in Columbus. [Notes: show parking lot photo]

Robbery detectives just released surveillance images from the November crime.

The girl was riding her hoverboard in the parking lot with her family when they say two men pointed a gun at her head, taking it.

[Notes: show suspect pic]

Columbus Police say suspects—seen here—took off in a PT cruiser.

(Capitalization and brackets sic.) Construing this publication from the perspective of a viewer watching a crime-stoppers report, it is clear that the CPD was seeking information from the community about the robbery or the suspects.

{¶ 90} Like the first publication, this publication would not be mistaken as a publication about an arrest or conviction of a robber. A viewer would understand that the information being viewed was about an ongoing police investigation into an unsolved crime. Given the context of the publication, a reasonable viewer would not view the report as defamatory.

{¶ 91} The Andersons argue that this publication declares that the two unknown men depicted in the interior photograph are the robbers, thereby making the publication defamatory. However, this argument is sustainable only if portions of the publications are considered in isolation.

{¶ 92} Both parties agree, citing *Am. Chem. Soc*., 133 Ohio St.3d 366, 2012-Ohio-4193, 978 N.E.2d 832, at ¶ 79, that we must consider the entire context of the publication in determining whether a reasonable viewer would interpret the publication as defamatory. The Andersons' argument that WBNS's publication was defamatory because it referred to the men in the interior photograph (Aaron and Arron) as "robbers" rather than "suspects" is based on textual isolation. "[C]ourts do not look at an allegedly defamatory statement in a vacuum." *Sabino*

*v. WOIO, L.L.C.*, 2016-Ohio-491, 56 N.E.3d 368, ¶ 47 (8th Dist.). Unlike in *Sullins v. Raycom Media, Inc.*, 2013-Ohio-3530, 996 N.E.2d 553, ¶ 19 (8th Dist.), a case in which it was reported in a television program that Sullins was one of "Cleveland's 25 Most Wanted Fugitives" when he was not a wanted fugitive, here, both words, "robbers" and "suspects," appear in the publication. The report begins, "Columbus Police hope you recognize," which is the purpose of a crime-stoppers report: garnering tips and information about suspects in a crime. The script in the short broadcast accurately reports that two men robbed a girl at gunpoint; it also characterizes the two pictured men as "suspects"; and the publication ends with the statement "suspects—seen here—" and the interior photograph.

{¶ 93} The overriding conclusion to be drawn from the story is that the two men were suspects. Viewing the entire publication—its plain text, its composition, its neutral thrust, its factual accuracy, its intent and purposes, and its implications and connotations—reasonable minds can come to but one conclusion and that conclusion is that the publication is not defamatory.

{¶ 94} The last CrimeTracker 10 report complained of was posted on WBNS's webpage and Facebook page. The headline read, "Robbers Put Gun To Child's Head And Steal Hoverboard." (Boldface deleted.) The body of the article read:

> Columbus police are searching for two men who robbed a child at gunpoint in east Columbus.
>
> It happened Sunday, November 26, 2015 outside Fort Rapids Water Park around 10 PM.
>
> Police say the victim was riding her hoverboard while in the parking lot with her family when they were approached by two men. The suspects put a gun to the 8-year-old-girl's head and demand[ed] the toy.

When she handed it over, the two men ran to a white PT Cruiser and took off.

Investigators say there was a woman with the two male suspects. They are not sure how she is connected to the robbery.

No one was injured during the robbery.

If you have any information about this incident, call Columbus Police at 614-645-4665 or make an anonymous tip to Central Ohio Crime Stoppers at 614-645-TIPS (8477).

A reasonable person reading the entire report and construing the report from the perspective of a crime-stoppers reader would not interpret the publication to be defamatory.

{¶ 95} The Web reports are accurate: the CPD was searching for two men who had robbed a child at gunpoint in the parking lot of the Fort Rapids indoor waterpark; the crime did happen on November 26, 2015, at approximately 10:00 p.m.; the girl was riding her hoverboard when she was robbed; and her parents were with her at the time of the robbery. After the commission of the robbery, the two men were seen fleeing the scene in a white PT Cruiser.

{¶ 96} Despite the fact that the online report accurately reflected the information WBNS received from the CPD, the Andersons nevertheless argue that the entire content cannot negate the defamatory content of the headline, "**Robbers Put Gun To Child's Head And Steal Hoverboard.**" (Boldface sic.) The only question is, does the inclusion of the interior photograph with the headline convert the publication to a defamatory publication? It does not.

{¶ 97} A headline of an article cannot be read in isolation, it must be read in the context of the article following it. *See Crall v. Gannett Satellite Information Network, Inc.*, S.D. Ohio No. C-2-92-233, 1992 WL 400713, *3 (Nov. 6, 1992) (When considering whether a statement is defamatory, the court must not look

solely to the allegedly defamatory statements but must also consider the statements in the context of the entire article; therefore, the headline at issue must be construed along with the ensuing article).

{¶ 98} The publication ends with a plea for help: "If you have any information about this incident, call Columbus Police * * * or make an anonymous tip to Central Ohio Crime Stoppers * * *."

{¶ 99} A reasonable person reading the Web reports in their entirety and considering their context—crime-stoppers reports—would not interpret the publications to be defamatory. The overriding conclusion to be drawn from the story is that the two men were suspects. Viewing the entire publication—its plain text, its composition, its neutral thrust, its factual accuracy, its intent and purposes, and its implications and connotations—reasonable minds can come to but one conclusion and that conclusion is that the publication is not defamatory.

{¶ 100} Therefore, I would conclude that WBNS's publications at issue in this case were not defamatory as a matter of law. Consequently, it is unnecessary to consider the fault standard established in *Lansdowne*, 32 Ohio St.3d 176, 512 N.E.2d 979.

**The Bigger Picture**

{¶ 101} In the end, the CrimeTracker 10 reports yielded exactly what they were expected to—community tips to obtain information about the identity of the two unknown males in the only clear photograph the CPD had in order for the CPD to find them, interview them, and determine whether they were connected to the armed robbery of an eight-year-old child. That happened, and the Andersons were cleared of any wrongdoing.

{¶ 102} The state of Ohio, as an amicus curiae in support of WBNS, argues that media outlets provide an invaluable service to the general public and law enforcement by publicizing requests for tips. I agree.

**{¶ 103}** Crime-stoppers news features have been an invaluable tool of law enforcement since 1976. Briseno, *APD detective started Crime Stoppers program 40 years ago in Albuquerque* (Oct. 16, 2016), https://www.abqjournal.com/867864/on-a.html (accessed July 15, 2019). In July 1976, hoping to get a lead in the investigation of the homicide of Michael Carmen, a young college student, Detective Greg MacAleese turned to the eyes and ears of the citizens of Albuquerque, New Mexico, to ask for help in solving the murder. *Id*. Since that time, according to the article, crime-stoppers programs have aided in the arrest of more than one million criminals and the recovery of more than $2 billion in stolen property. *Id*.

**{¶ 104}** And while some of the comments posted by the public to WBNS's webpage were horrendous, offensive, hurtful, and deplorable, those comments are not a result of the CrimeTracker 10 publication. Those comments are a sad commentary on the lack of civility in the electronic world: some people enjoy the ability to anonymously post ugly comments and pass judgment as to the guilt or innocence of the people depicted in a photograph in a crime-stoppers report asking for help identifying them.

### Conclusion

**{¶ 105}** We should address the threshold issue whether the publications are defamatory; the determinations of the trial court and appellate court on that issue were essential to their holdings and thus were not dicta. Moreover, I disagree with the majority's determination that the court of appeals' "stronger duty" language is meaningful; it is not a holding and is nothing more than dicta.

**{¶ 106}** Regarding the defamatory nature of the publications, I conclude, after reviewing each publication as a whole and construing each publication from the perspective of a viewer watching or reading a crime-stoppers report seeking information about unknown suspects who may be connected to a robbery, that a reasonable viewer or reader would not interpret the "CrimeTracker 10" publications

as defamatory. Therefore, I would reverse the Tenth District Court of Appeals' judgment and reinstate the trial court's judgment in favor of WBNS.

{¶ 107} Instead, this court remands this matter to an appellate-court panel that no longer exists (two-thirds of the judges on the original panel are no longer on the bench) to resolve an issue that does not exist. Perhaps that court will remand the cause to the trial court, and since the trial judge who granted summary judgment is no longer a common pleas court judge, a new trial judge will begin considering the case.

{¶ 108} It has been two years since the Andersons filed their first appellate brief. How many more months or years have been added to the litigation process today? Article I, Section 16 of the Ohio Constitution does more than guarantee a citizen's right to seek a remedy by due course of law "for an injury done him in his * * * reputation," it also provides that justice shall be "administered without denial or delay." This court falls far short of that mandate today.

_____

Calig Law Firm, L.L.C. and Sonia T. Walker; Jones Law Group, L.L.C., Eric A. Jones, and Nicholas Kolitsos, for appellees.

Zeiger, Tigges & Little, L.L.P., Marion H. Little Jr., and Kris Banvard, for appellant.

Dave Yost, Attorney General, Benjamin M. Flowers, State Solicitor, and Michael J. Hendershot, Chief Deputy Solicitor, urging reversal for amicus curiae the state of Ohio.

Vorys, Sater, Seymour & Pease, L.L.P., John J. Kulewicz, Thomas E. Szykowny, Daniel E. Shuey, and Arryn K. Miner, urging reversal for amici curiae The Ohio Association of Broadcasters, Ohio News Media Association, American Society of News Editors, Associated Press Media Editors, Radio Television Digital News Association, Reporters Committee for Freedom of the Press, and Society for Professional Journalists.

January Term, 2019

_____